No. 46,370

DOROTHY V. BORING, INDIVIDUALLY, and DOROTHY V. BORING, PARENT and NATURAL GUARDIAN OF GERALD H. BORING, a Minor, *Appellants*, v. STUART ALFRED DOUGLAS HAYNES, AS THE REPRESENTATIVE UNDERWRITER FOR LLOYD'S OF LONDON, *Appellee*.

(496 P. 2d 1385)

Opinion filed May 6, 1972.

*Terry O'Keefe*, of Wichita, argued the cause, and *Dale Kidwell* and *Walter C. Williamson*, both of Wichita, were with him on the brief for the appellants.

*Byron Brainerd*, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an action by the beneficiaries under a group policy of accident insurance for recovery of death benefits. Plaintiffs contend the insured's death was occasioned by accidental bodily injury; defendant insurer denies this assertion and says it was caused directly or indirectly, wholly or partly by disease.

The trial court sustained defendant's motion for summary judgment and plaintiffs have appealed.

Pertinent portions of the certificate of insurance are:

"Underwriters . . . agree . . . if . . . the Assured shall sustain accidental bodily injury which shall . . . occasion his death . . . Underwriters will pay . . ."

"EXCLUSIONS. This Certificate does not cover bodily injury . . . (b) caused directly or indirectly, wholly or partly . . . by disease."

The trial court had before it the deposition of Dr. C. G. Leitch, taken by defendant-appellee, together with certain exhibits referred to in the deposition, plus the death certificate of the decedent. Plaintiffs had previously indicated by way of answer to defendant's interrogatory that they would rely on Dr. Leitch's deposition and the exhibits to establish their claim. From these documents the following may be gleaned:

On April 25, 1966, H. O. Boring, who was employed by Kansas Gas and Electric Company as a supervisor, obtained through his employer the policy in question in the principal sum of $25,000. His medical record begins in the year 1955 with treatment by his family doctor for stomach and other minor problems. On March 9, 1967, he was admitted to the Wesley Medical Center, Wichita, for x-rays of his gall bladder, which was found to be diseased. During this period of his medical history Mr. Boring's electrocardiograms were essentially normal. He was dismissed from the hospital March 14, 1967. That same evening he had his first myocardial infarction and he was readmitted to the hospital. He had a relatively uneventful recovery phase from his infarction and was discharged from the hospital April 4, 1967, on cumidin. His heart consultant saw him on office visits during April. Boring was suffering attacks of cholecystitis and was having occasional episodes of tightness in

his chest with exercise but on followup examinations in April he continued to check out well with no signs of heart failure or further infarction. In late April nitroglycerin and probanthine were prescribed. He was hospitalized again from May 12 to May 16, 1967, for gall bladder attacks. He reentered Wesley hospital June 17, 1967, for gall bladder removal, which operation was performed without difficulty and he was discharged June 20, 1967.

Although he did not return to work Mr. Boring was active around the house; he rebuilt the water pump in his back yard, poured a three foot square concrete slab, climbed up on the roof and fixed the antenna. He was seen July 5, 1967, by his heart consultant who found he had no gastrointestinal or cardiac symptoms and was doing well. July 6, 1967, his family doctor advised him he could plan to return to work July 24 if his heart consultant released him.

On July 17, 1967, Mr. Boring was driving an automobile belonging to his employer on a Wichita street. While at an intersection his automobile was struck in the rear by another vehicle. He got out of his automobile and talked to some of the people involved in the accident. When he saw that apparently no one was badly hurt he returned to look at the damage to his car and suddenly collapsed to the ground. He was taken to nearby Wesley hospital where he was pronounced dead upon arrival. The autopsy report contained the following:

*"Final Anatomic Diagnosis*

*Primary*

"Arteriosclerotic heart disease.

"Coronary thrombosis, right coronary artery, old.

"Old myocardial infarction, posterior wall left ventricle.

"Congestion of viscera."

The death certificate indicated the immediate cause of death to be myocardial infarction due to coronary arteriosclerosis. Mr. Boring was fifty-four years of age at the time of his death.

In his deposition Dr. Leitch, who was engaged extensively in the practice of industrial medicine but who had not examined Mr. Boring, testified hypothetically as to Boring's condition and the cause of death. The following appears in his direct examination by appellee:

"Q. Well, Doctor, do you have an opinion as to whether or not the death of Mr. Herschel O. Boring on July 17th was caused by, and I quote, 'Accidental bodily injury'?

"A. Yes, I do.

"Q. Well, in formulating such an opinion as to whether or not his death was caused by, 'Accidental bodily injury', what meaning or definition did you attach to the phrase, 'Accidental bodily injury'?

"A. Well, I attached to it what we recognize in pathology and in medicine as circumstances which in themselves may produce either organic or functional abnormalities of the body capable of producing an individual's death either directly or by influencing other already existing conditions.

"Q. Well, then, the meaning of the definition of the phrase as you have just given me, what bodily injury did Mr. Boring sustain which caused his death on July 17, 1967?

"A. Well, I think that Mr. Boring sustained, as a result of the episode in which he was involved, a stress situation which caused his body to react under the influence of pressors arising out of the experience which resulted in his attempt to develop an increased coronary artery volume flow from his heart, which was already diseased, and that, as a result of that, he developed a functional situation which we recognize as acute coronary insufficiency complicated by cardiac arrest.

"Q. Well, Doctor, you do recognize that nowhere in this material which you have handed me is there any references to or any finding of, any bruises, abrasions, contusions, cuts, fractures, or any physical injury, don't you?

"A. No, I think it is equivocated a little bit in the pathology report, but nothing definite is identified as being evident in the form of external bodily trauma.

"Q. You did accept as true, didn't you, Dr. Eckert's statement from the autopsy report which has been marked Defendant's Deposition Exhibit F, 'The body is that of an elderly white male, which is fully clothed, and shows no evidence of any injury or damage to the clothing or the body. There are no marks of trauma or any evidence of injury.' You do accept that as true, don't you?

"A. Yes, sir.

.  .  .  .  .  .  .  .  .  .  .  .  .

"Q. And you also accept as true the fact that there was no evidence in the examination of any other part of the body as to any physical injury, trauma, contusion, bruise, abrasions, or anything else, don't you, Doctor?

"A. Yes, except they had a dead body.

"Q. Now, Doctor, what is your opinion as to whether or not Mr. Boring's death on July 17, 1967, was caused by accidental bodily injury?

"Mr. O'Keefe: I object to this as repetitious. He has already answered it.

"A. My opinion is that Mr. Boring's death occurring on July 17, 1967, arose as a result of bodily injury arising out of a circumstance which produced aggravation of an already existing arteriosclerotic heart disease with cardiac insufficiency and cardiac arrest.

"Q. (By Mr. Brainerd). If you would, Doctor, enumerate the medical findings upon which you base that opinion?

"A. Well, I base it upon the basis of the fact that I have a post mortem report in the case of an individual who is obviously dead, who has post mortem evidence of existing arterial disease, existing coronary artery disease, existing myocardial pathology arising out of limiting coronary sclerosis, plus the residuals of a myocardial infarction, plus the fact that a man suffered an experience in which he responded unfavorably because his heart couldn't respond to the situation, and he developed a cardiac arrest.

"Q. Well, Doctor, not for the purpose of arguing with you, but if I understand your testimony correctly, you reached your opinion, but you recognize that there is no evidence in this record or the material you had available to you of any physical injury to Mr. Boring's body?

"A. I base it on the fact that there is already distinct disease, there is history of an experience. Medicine bases itself upon pathological changes plus other knowledges that relate to the reaction of tissues to circumstance, and on the basis of a broad experience of my own in which, on numerous occasions, I have seen this same sort of situation, and my opinion is agreed in by many medical authorities and pathology authorities.

"Q. Now, Doctor, during the course of your testimony heretofore, you have referred—and my notes are not too good—but I think you referred to a pre-existing arterial disease, pre-existing artery disease, a pre-existing myocardial infarction, and the results of his physical condition as reflected by these medical records?

"A. Yes, sir.

"Q. In that connection, Doctor, do you have an opinion as to whether or not Mr. Boring's death was caused, and I quote, 'Directly or indirectly, wholly or partly, by disease', end of quote?

"A. I think it was caused by the influence of an episode of stress superimposed upon already existing circulatory disease manifested by arteriosclerosis, coronary sclerosis and a previous myocardial infarction.

"Q. Doctor, to be sure I understand your response, do I understand that, in your opinion, the pre-existing physical condition entered into and was a part of the cause of Mr. Boring's death on July 17, 1967?

"A. I have the opinion that the already existing disease conditions as evidenced by available records had a part in this in that the significance of their degree was precipitated by the circumstances under which this man sustained this accident, and that the accident precipitated indirectly the other direct factors which were already at work, but which were not of sufficient degree to cause a man's death.

"A. Dr. Eckert's final anatomical diagnosis is based upon his gross pathological findings and are recorded as arteriosclerotic heart disease, coronary thrombosis, right coronary artery, myocardial infarction, posterior wall of the left ventricle, congestion of viscera.

"Q. Doctor, do you have an opinion, based upon your study of the material submitted to you by Mr. O'Keefe and your general medical training, as to whether or not those conditions as listed by Dr. Eckert existed prior to Mr. Boring's death?

"A. Yes, I think these conditions existed prior to Mr. Boring's death. His death was actually precipitated by the superimposition of a stress episode.

"Q. Again, in an effort to understand you so that I don't confuse myself, it is your opinion that the emotional or physical stress to which Mr. Boring was subjected shortly prior to his death, and superimposed upon his previous existing physical condition resulted in his death, is that correct?

"A. That is correct, yes."

On cross-examination by appellants Dr. Leitch gave the following testimony:

"It is not necessary that a person have some actual physical damage to his body, such as an abrasion, when that person is in an accident in order to come under stress and strain. Anger, stress and physical exertion, emotion can trigger off pathological processes in an individual's body without any external or superficial evidence of injury and may result in the individual's death. Every individual reacts to a particular accident differently. The pattern may be essentially the same but there are different features."

In response to a hypothetical question embodying the history already outlined, the doctor stated his opinion within reasonable medical certainty was that Boring's cardiac situation was dormant and stable on July 17, 1967, prior to his auto accident; that the accident precipitated an already existing cardiac disease to the extent it resulted in coronary insufficiency and cardiac arrest; it precipitated a train of symptoms superimposed upon his already existing cardiac disease which resulted in his acute coronary insufficiency and cardiac arrest or a systole.

Mr. Boring's family physician stated in a written report he believed the emotional upset from the car accident produced undue strain and precipitated Boring's death from the heart condition and that the accident was a contributing factor in the death. The heart consultant's report stated the cause of death could have been either natural or related to the excitement concerned with the accident; that there is no way of determining for sure what precipitated the final event causing death. He suggested further check into the microscopic results of the postmortem examination.

The issue on appeal is whether the trial court erred in applying the extreme remedy of summary judgment upon the showing made. Generally, under K. S. A. 60-256 (c), before a summary judgment may be granted the record before the court must show conclusively

that there remains no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. We have several times elaborated on the rules governing the propriety of summary judgments and reiteration is unnecessary (see *Albright v. McElroy*, 207 Kan. 233, 484 P. 2d 1010).

Appellants contend the decedent's heart disease was in a dormant condition at the time of the automobile collision and the emotional stress and strain precipitated the heart attack causing his death, which constituted accidental bodily injury within the meaning of the policy provisions.

Appellee asserts the evidence conclusively reveals death was caused wholly or partly by disease within the purview of the exclusionary clause and that emotional stress and strain cannot result in accidental bodily injury within the meaning of the policy.

For their position appellants rely on our decision in *William v. Benefit Trust Life Ins. Co.*, 200 Kan. 51, 434 P. 2d 765, a suit to recover accident benefits resulting from a fall down a flight of steps by one afflicted with osteoarthritis in both knees. Upon first trial of the action a motion for directed verdict was sustained at the close of plaintiff's evidence. On appeal this court held the evidence to be sufficient for submission to a jury and reversed the case for a new trial (*Williams v. Benefit Trust Life Ins. Co.*, 195 Kan. 579, 408 P. 2d 631). Upon retrial the jury found plaintiff entitled to the benefits claimed and the defendant insurer appealed. The insurance policy on which recovery was sought contained language substantially the same as that in the case at bar, both as to accidental bodily injury and the clause excluding benefits where the loss was due to disease, wholly or in part.

In the second *Williams* appeal this court recognized a split of authority on interpretation of this kind of policy provisos. We stated:

"There appears to be a distinct conflict of opinion between the several jurisdictions of this country as to the extent of an insurer's liability under an accident insurance policy containing provisions similar to those quoted above, where the insured has an antecedent disease or sickness. This conflict of authority is set out in 45 C. J. S., Insurance, § 776, p. 813, in these words:

" 'It has been held that no recovery can be had for a death or disability, on the ground that it results solely from accidental injury, where the injury aggravates the effect of a preexisting disease or infirmity, or the disease or infirmity aggravates the effect of the injury, and both together cause the death or disability, even though it is thereby caused at a period sooner than it otherwise would have occurred. *On the other hand, it has been held that where the*

*death or disability results from an accidental injury aggravating or rendering active a dormant disease or infirmity, it will be regarded as being caused solely by the injury, so as to render insurer liable therefor, even though the death or disability might have resulted at a later period regardless of the injury, and even though the accident would not have had such an effect on a normal person.'* (Emphasis added.)

"This court has recognized the divergence of opinion in *Williams v. General A. F. & L. Assurance Corp.*, 144 Kan. 755, 62 P. 2d 856. In that case action was brought by a policy holder to recover benefits for an injury to his back claimed to be due under an accident policy insuring against '. . . effects resulting directly and exclusively of all other causes, from bodily injury sustained during the life of this policy solely through external, violent and accidental means . . .' (p. 756.) The insurance company defended on the ground that the plaintiff's back was weakened from a prior accident from which he had not recovered. In the course of its opinion, which upheld a judgment in plaintiff's favor, the court said:

" 'The legal question raised is the interpretation to be given to the language of the policy "exclusively of all other causes." On this there are two lines of authorities. One line of authorities, upon which appellant relies, construes the language used in the policy to mean that if the insured had any disease or physical ailment, from any cause, at the time of the accidental injury for which he seeks to recover under the policy, and is unable to show clearly that such disease or ailment was not reflected in some degree in the injurious results of the accident, there can be no recovery under the policy. Under these authorities it is practically impossible for any but the physically sound to recover on an accident policy containing the language used, or tantamount to that used, in the policy here involved, and they place the burden on the plaintiff to show that the full effect of the injury following the accident was independent "of any preexisting disease, or bodily infirmity, as a contributing cause thereof." (Citing cases.)

" 'The other line of authorities, recognizing the fact that many persons not physically sound in every respect carry accident insurance policies, take what seems to us a more rational view and construe the language of the policy to mean that if the accident be shown to be the cause of the injury for which the action is brought plaintiff can recover.' (p. 757.)

"In *Johnson v. Farmers and Bankers Life Ins. Co.*, 173 Kan. 8, 244 P. 2d 199, this court took further note of the legal dichotomy, but concluded it was not then necessary to determine which rule should be followed. On page 11 it was said:

" 'Appellant contends that the proper rule to be applied here is that where an accident aggravates a dormant disease and as a result the insured died at an earlier date than he otherwise would, the accident is the direct and independent cause of the insured's death within the meaning of the double indemnity provision of the insurance policy in this case, and that his evidence made a prima facie case under the rule. Appellee contends that the rule to be applied is that where the insured is afflicted with a disease at the time of the accident, which disease proximately causes or substantially contributes to the death, such death is not within the terms of the policy.'

"We think the better reasoned rule, and the rule which, in effect, was followed in *Williams v. General A. F. & L. Assurance Corp.*, supra, to be just this: that where an accidental injury aggravates or energizes a dormant disease or physical ailment the accident may be said to have been the proximate cause of the resulting disability within the terms and meaning of the ordinary accident insurance policy." (pp. 54-55.)

Our holding in second *Williams* on this aspect was summarized thus:

"Where an accidental injury activates or aggravates a dormant disease or physical infirmity, the accident may be said to have been the proximate cause of the resulting disability within the usual provisions and ordinary meaning of a policy insuring against accident.

"In the event an insured sustains physical disability resulting from an accidental injury which aggravates or causes a dormant disease or ailment to become active, the disability will be regarded as having been caused solely by the injury, so as to render an insurer liable therefor under an accident policy, even though such disability might later have resulted regardless of the accident, and even though the accident might not have affected a normal person to the same extent.

"A dormant disease is one which is quiescent, passive, resting or static as opposed to one which is active, lively, or effective." (Syl. ¶¶ 1, 2, 3.)

In 10 Couch on Insurance 2d (Anderson) § 41:79 we find this discussion in connection with risks covered under accident insurance:

"**Accident activating prior latent disease or condition—Harm covered.**

"Where an accident results in a diseased condition causing total disability, the accident, and not the disease, is the exclusive cause of the disability although the disease was present in a harmless and latent form prior to the accident which activated it. Accordingly, a death caused by bodily injury accidentally sustained is within the terms of a double indemnity provision if by reason of the frailty or general weakness of the insured, a predisposition to a disease, or the presence of a disease then inactive or dormant, an accident results in a fatal termination, even if this result would not have followed if the insured person had been in normal health." (p. 102.)

We see no reason why the foregoing rules should not be applicable to the case at bar and we hold that they are.

Appellee contends the term accidental should be given its usual ordinary meaning, that is, the meaning which common usage conveys to the ordinary layman and, viewed in this light, no accident occurred to the decedent. In *Miller v. Prudential Ins. Co.*, 183 Kan. 667, 331 P. 2d 310, this court was concerned with the meaning of the term as used in a double indemnity insurance policy, where death of an oil field worker had resulted from a heart attack sus-

tained in the ordinary course of work. The fact finder held against the policy beneficiary. On appeal this court impliedly recognized that an unusual happening may constitute an accident when it said:

". . . if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means, but if in the act which precedes the result something unforeseen or unusual occurs which produces it, then it has been produced through accidental means.

"In this case, as far as the evidence discloses, the deceased was an experienced oil field 'roughneck' and was performing the usual and ordinary work as such. There was no evidence of any slip, mishap, extraneous force, unusual occurrence or unforeseen development which took place at any time in the performance of the work." (p. 670.)

In second *Williams, supra,* we approved an instruction which defined an accident as an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often, but not necessarily, accompanied by a manifestation of force (p. 59).

In *Rankin v. United Commercial Travelers of America,* 193 Kan. 248, 392 P. 2d 894, the holder of an accidental death policy died from a heart attack sustained while fighting a pasture fire. The policy provided benefits only for loss "effected solely through external, violent and accidental means, herein termed the accident, which shall be occasioned by the said accident, alone and independent of all other causes." (p. 251.)

The case was submitted to the trial court as a question of law to be decided upon certain stipulated facts including an admission that emotional strain can and does precipitate heart attacks. In reversing a judgment for the insurer this court quoted approvingly from 56 ALR 2d 816, as follows:

" 'There is seemingly general agreement on the proposition that if an unusual happening occurs in conjunction with exertion or exercise on the part of the insured, and this is followed by a heart attack, recovery may (assuming causation is established) be had under a policy providing benefits for the results of "accidental means," whether the unusual happening precipitated the exertion or occurred in the course of the same.' " (pp. 256-257.)

The record here reveals an unusual external stimulus—the automobile collision—exerting that which has been characterized as emotional stress and strain upon the decedent, so as to precipitate or cause his death. Assuming that causation is factually established, we believe this fortuitous event constitutes accidental bodily injury within the meaning of the policy provisions and we so hold.

Appellee stresses the fact decedent's body bore no outwardly visible marks of trauma or injury. Although the contention is actually disposed of by that which has already been said, such indicia have never been held requisite to a showing of accidental bodily injury. In *Pinkston v. Rice Motor Co.*, 180 Kan. 295, 303 P. 2d 197, a proceeding under the workmen's compensation act, it was held that the term "personal injury" as used in the act is to be construed as meaning any lesion or change in the physical structure of the body, causing damage or harm thereto and it is not essential that the disorder be of such character as to present external or visible signs of its existence. We see no reason for the application of any different rule here.

Finally, appellee urges that our decision in *Thompson v. Aetna Life Ins. Co.*, 201 Kan. 296, 440 P. 2d 548, should be dispositive of this appeal in its favor. Areas of similarity in the two cases exist but the distinguishing feature is that in *Thompson* the trier of the fact determined as a fact, upon medical evidence held to be sufficient, that there was no causal connection between the death of the arteriosclerotic patient and the fortuitous event relied upon as the accident. In the case at bar no determination respecting causation has been made by the finder of fact. Although their evidence may be controverted upon trial, appellants are entitled, upon the showing presented, to that determination. Consequently we must hold the trial court erred in summary disposition.

The judgment is reversed and remanded with directions for further proceedings in harmony with the views herein expressed.

APPROVED BY THE COURT.