(140 P.3d 438)
No. 95,202

RENE THOMAS, as Parent and Natural Guardian of Juliana Sanchez and Viviana Sanchez, Minors and Heirs at Law of Ramon Sanchez, and VICTOR REYES, *Appellees,* v. BENCHMARK INSURANCE COMPANY, *Appellant.*

410

filed August 18, 2006.

*J. Franklin Hummer*, of Shawnee Mission, for appellant.

*Mark Beam-Ward*, of Hill, Beam-Ward, Kruse, & Wilson, LLC, of Overland Park, for appellee.

Before MALONE, P.J., GREEN, J., and BUKATY, S.J.

GREEN, J.: Ramon Sanchez was killed and Victor Reyes was injured when Melissa Gutierrez lost control and wrecked the car that she was driving. Both Sanchez and Reyes were passengers in the car. Reyes, along with Rene Thomas, who is the mother of Sanchez, and the natural guardian of Sanchez' minor children, filed a declaratory judgment action. Reyes and Thomas, the plaintiffs, sought to determine whether Gutierrez, who also died in the wreck, had liability coverage for the wreck under a car insurance policy issued to her by Benchmark Insurance Company (Benchmark). Benchmark contended that no liability coverage existed under the policy because of the illegal acts of Gutierrez, Sanchez, and Reyes. The trial court, however, granted summary judgment in favor of the plaintiffs upon finding that Benchmark's illegality defense was inapplicable to this case. We agree. The trial court, however, did not address Benchmark's other argument that liability coverage was excluded under the unexpected and unintended act provisions of its policy. Determining that an intent to injure can be inferred from the nature of the act and the foreseeability of harm flowing from that act, our Supreme Court, in *Bell v. Tilton*, 234 Kan. 461, Syl. ¶ 2, 674 P.2d 468 (1983), declared: "Where an intentional act results in injuries which are a natural and probable result of the act, the injuries are intentional." We determine that Gutierrez' pur-

poseful conduct in driving a car at speeds of up to 100 m.p.h. in an attempt to elude police would meet the above test. As a result, we reverse the judgment of the trial court.

The parties do not dispute the basic facts of what transpired the night of November 8, 2003. Reyes went to a pub in Overland Park, Kansas, with Sanchez and Gutierrez. While at the pub, they consumed alcohol, and Reyes and Sanchez got into a fight with several other individuals that began inside the pub. The fight later moved outside the pub. Reyes and Sanchez got into Gutierrez' car. Sanchez sat in the front passenger seat, and Reyes sat in the back seat. Sanchez grabbed a gun and fired approximately 10 shots in the general direction of a crowd of people. Gutierrez then drove off at a high rate of speed and eventually entered Interstate 635, where a police officer spotted them and began pursuit. After the officer activated his emergency lights, Sanchez threw the gun out of the car. Then, Gutierrez pulled onto the shoulder of the highway and stopped the car. When the officer got out of his car, Gutierrez drove off. According to Reyes, he and Sanchez had told Gutierrez not to drive off, but "she just took off anyway."

The officer lost sight of Gutierrez' car as she exited onto Shawnee Drive. According to Reyes, Gutierrez lost control of the car while on Shawnee Drive. The car flipped several times, and Sanchez was thrown from the car.

Gutierrez and Sanchez died as a result of injuries they sustained in the wreck. Reyes, who was wearing a seatbelt, survived but sustained various injuries. The record indicated that Gutierrez was driving at speeds of 100 m.p.h. while attempting to elude the police.

Benchmark defended the plaintiffs' declaratory judgment action, in part, on an illegality defense theory. Benchmark argued that public policy precluded the plaintiffs from being indemnified for the damages caused by the criminal conduct of Gutierrez and the passengers in attempting to elude police during a high speed car chase. Benchmark also contended that the intentional conduct of the occupants barred recovery.

Plaintiffs moved for summary judgment. Following a nonevidentiary hearing, the trial court granted plaintiffs' motion for sum-

mary judgment. The trial court determined that the illegality defense did not apply. The court explained: "The Court considers the prior illegal acts that occurred before the eluding of the police as being too remote in time. Regarding the eluding, the Court does not find that there is any evidence to show that Sanchez or Reyes were involved in the decision to elude the police."

*Did the trial court err in granting summary judgment in favor of plaintiffs?*

Benchmark challenges the trial court's entry of summary judgment in favor of the plaintiffs on several grounds: (1) The trial court failed to give Benchmark, as the nonmoving party, the benefit of all inferences to be drawn from the evidence, particularly with respect to the occupants' willing participation in crimes and the driver's intentional conduct; (2) the trial court erroneously concluded that no causal connection existed between the events at the pub and the later wreck; (3) the insurance policy and public policy prohibit coverage for such intentional and malicious acts as those that occurred here; and (4) the trial court erred in rejecting Benchmark's argument that the "illegality defense" barred coverage.

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citation omitted.]' [Citations omitted.]" *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

To the extent there is no factual dispute, appellate review of a trial court's order regarding summary judgment is unlimited. *Roy v. Young*, 278 Kan. 244, 247, 93 P.3d 712 (2004). Further, this court has unlimited review over the interpretation of insurance contracts. Hence, we are not bound by the trial court's interpre-

tation of the policy at issue. See *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003).

*Intentional acts*

On appeal, Benchmark raises an argument that it made below. Benchmark maintains that the intentional act of Gutierrez in driving at excessive speeds prohibited recovery under the insurance policy. Benchmark contends that the wreck was a " 'natural and probable consequence' " of Gutierrez' actions. In granting plaintiffs' motion for summary judgment, the trial court did not address Benchmark's argument that its intentional act exclusion barred coverage under its insurance policy.

The insurance policy issued by Benchmark to Gutierrez provides, in relevant part, that Benchmark "will pay **damages** for **bodily injury** or **property damage** for which **you** or any **family member** becomes legally responsible because of an **auto accident**." The policy, in turn, defines "**auto accident**" as "an unexpected and unintended event that causes **bodily injury** or **property damage** and arises out of the ownership, maintenance or use of an **auto** or other **motor vehicle**." The policy further states: "This coverage does not apply to **bodily injury** caused intentionally by **you** or any **family member**." It is this clause that Benchmark relies on in arguing that Gutierrez' intentional act in driving at excessive speeds on both the highway and residential streets precluded recovery.

Insurance coverage provisions are to be interpreted broadly to afford the broadest protection to the insured. *State Farm Fire & Cas. Co. v. Falley*, 23 Kan. App. 2d 21, 22, 926 P.2d 664 (1996), *rev. denied* 261 Kan. 1086 (1997). It is important, however, for limiting or exclusionary insurance provisions to be construed narrowly against the insurer. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 327, 961 P.2d 1213 (1998); *Falley*, 23 Kan. App. 2d at 22. An exclusion for damages arising from intentional acts is expressly permitted by K.S.A. 40-3107(i)(6).

As Benchmark points out, this court has provided guidance in interpreting exclusionary clauses such as the one at issue here. In *Falley*, the insurance policy at issue excluded coverage "for any

damages arising from an intentional act." 23 Kan. App. 2d at 22. After acknowledging the public policy prohibiting coverage for intentional and malicious acts, this court stated that neither an overly restrictive interpretation of an intentional act exclusion nor the adoption of a test which depends upon an after-the-fact account of the insured's subjective intent would serve such public aims. Further, the *Falley* court rejected the insurance company's assertion that once an intentional act is shown, the exclusion should apply to *any* damages that result. In doing so, this court explained that to adopt such an overly broad interpretation of the exclusion would effectively negate coverage under the policy. 23 Kan. App. 2d at 27.

Ultimately, the *Falley* court adopted the following test for determining whether an intentional act exclusion applies: "[W]e conclude the exclusion for 'any damages arising from an intentional act' encompasses any injury which is a natural and probable consequence of the insured's intentional act." 23 Kan. App. 2d at 28.

Benchmark contends that the wreck and the resulting fatalities and injuries were a direct result of Gutierrez' attempt to elude the police. As a result, Benchmark argues that the wreck was a natural and probable consequence of Gutierrez' intentional act of speeding. Benchmark maintains that "[n]o one can drive at that speed [100 m.p.h.] on those kinds of streets for that long without expecting to wreck to [*sic*] kill or injure someone."

On the other hand, the plaintiffs contend that although Gutierrez was driving "at a reckless and excessive speed," her loss of control of the car "was undesigned and unexpected, i.e. an accident." Plaintiffs argue that to construe actions such as that of Gutierrez in any other way would be contrary to prevailing law and could lead to absurd results. Plaintiffs suggest that an insurance company could simply deny coverage any time an insured exceeded the speed limit on the ground that such conduct was intentional.

Although *Falley* is instructive, it is distinguishable from this case based on the language of the exclusionary provisions. In *Falley*, the policy excluded coverage " 'for any damages arising from an intentional act.' " 23 Kan. App. 2d at 26. Here, the Benchmark policy excluded bodily injury or property damage that was expected and

intended. Moreover, the Benchmark policy excluded bodily injury caused by an intentional act. In *Falley,* the damages needed not to be expected or intended. Moreover, the *Falley* court stated that "exclusion for injuries 'expected or intended by an insured' would apparently be narrower than an exclusion for 'any damages arising from an intentional act.' " 23 Kan. App. 2d at 26.

A basic function of insurance is that it will furnish indemnity for unexpected or fortuitous events. Defining the word "accident," this court held that the word had a generally accepted meaning in Kansas as " 'an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force.' " *Whitaker v. State Farm Mut. Auto. Ins. Co.,* 13 Kan. App. 2d 279, 282-83, 768 P.2d 320 (1989) (quoting *Gilliland v. Cement Co.,* 104 Kan. 771, 773, 180 Pac. 793 [1919]); see also *Boring v. Haynes,* 209 Kan. 413, 422, 496 P.2d 1385 (1972) (approving *Gilliland*'s definition of "accident"). Gutierrez' policy defined an auto accident as an "unexpected and unintended event that causes bodily injury or property damage and arises out of the ownership, maintenance or use of an auto or other motor vehicle."

Benchmark's use of the word "and" in defining an auto accident as an "unexpected and unintended event" requires the plaintiffs to show that the accident was both unexpected and unintended. In *Bell v. Tilton,* 234 Kan. 461, 674 P.2d 468 (1983), our Supreme Court adopted a test to be used when "expected" or "intended" language is used in an insurance policy exclusion.

Leading to its holding in *Bell,* our Supreme Court considered the nature of the act and the foreseeability of harm flowing from the act. In *Bell,* the insured, a young boy, shot a friend in the eye with a BB gun while playing a game. The insured testified in his deposition that he had not intended to injure his friend's eye. Nevertheless, there was evidence that the insured had intended to strike one of the boys at whom he was shooting and to cause a sting. The trial court determined that the insured should have expected an injury from his conduct in shooting a BB gun at his friend's face. Agreeing with the trial court, our Supreme Court stated:

"Under the 'expected or intended from the standpoint of the insured' policy exclusion language, it was not necessary for the garnishee insurance company to show Rusty Tilton specifically intended to strike Christopher Bell in the eye with a BB pellet in order to deny liability. Rather, if from the acts, circumstances, and inferences of the case, it appeared Rusty Tilton had the desire to cause the consequences of his acts or he believed the consequences were substantially certain to result, his conduct was intentional and the policy exclusion was operative." *Bell*, 234 Kan. at 472.

Applying this test, the *Bell* court determined that substantial evidence supported the finding that the insured had acted intentionally in shooting his friend.

Similarly, our Supreme Court in *Harris v. Richards*, 254 Kan. 549, 554, 867 P.2d 325 (1994), dealt with a homeowner's insurance policy that excluded coverage of " '[b]odily injury or property damage expected or intended by an insured.' " The issue was whether the insured's homeowner's policy provided coverage for injuries sustained by a victim when the insured fired shotgun rounds into the back window of a pickup truck. The insured knew the truck was occupied, but darkness prevented him from seeing whether he was shooting at his ex-wife or the victim. Shotgun pellets struck the victim's face. The insured then walked around to the side door and fired a third shot, killing his ex-wife. Later, the insured killed himself.

The victim sued the insured's estate to recover damages. The trial court entered summary judgment in favor of the estate, finding that the shooting was not a covered occurrence under the policy. Moreover, the trial court determined that the policy's intentional acts exclusion precluded coverage.

Our Supreme Court concluded that the shooting did not constitute an "occurrence," which the policy essentially defined as an accident. Moreover, citing *Bell*, the *Harris* court held that the victim's injuries were a "natural and probable consequence of [the insured's] act." 254 Kan. at 556. The court grounded its conclusion in the fact that the insured had knowingly fired his shotgun into the pickup truck, which he knew to be occupied. As a result, the *Harris* court affirmed the trial court's determination that the "intentional injury" exclusion prohibited recovery. 254 Kan. at 556.

The phrase "intended" that was construed in *Bell* and *Harris* has been interpreted at least three different ways in decisions of courts across this country. Jerry, Understanding Insurance Law § 63C (3d ed. 2002). The majority view is that "the insured must have intended both the act and to cause some kind of injury or damage." Jerry, Understanding Insurance Law § 63C, p. 483. Under the "minority view-intent," "the insured must have had the specific intent not only to injure but also to cause the particular type of injury suffered." Jerry, Understanding Insurance Law § 63C, p. 483. Finally, the "minority view-negligence" applies "the classic tort doctrine of looking to the natural and probable consequence of the insured's act" to determine intent. Jerry, Understanding Insurance Law § 63C, p. 483. Under this approach, "if the intentional act by the insured results in injuries or damage *that are a natural or probable result of the act,* the loss is intentional for purposes of the exclusion and no coverage exists." (Emphasis added.) Jerry, Understanding Insurance Law § 63C, p. 483.

In *Bell,* our Supreme Court clearly rejected a rule that would require the insurer to show that the insured specifically intended to cause the particular type of injury suffered. See also *Harris,* 254 Kan. at 553 ("We do not follow the specific intent rule."). Moreover, the *Bell* court did not adopt the majority approach: that the insured must have intended the conduct in question and intended some kind of injury or damage to result from the activity in question. Instead, it is clear that the *Bell* court adopted the approach that when intentional acts result in injuries or damages that stem from the natural and probable result of the acts, the injuries are intentional. Determining that an intent to injure can be inferred from the nature of the act and the foreseeability of harm flowing from that act, the *Bell* court declared: "Where an intentional act results in injuries which are a natural and probable result of the act, the injuries are intentional." 234 Kan. 461, Syl. ¶ 2. See also *Harris,* 254 Kan. at 553 (following the natural and probable consequences test adopted in *Bell*).

Nevertheless, the dissent suggests that we should follow the majority view:

"The majority opinion acknowledges that the majority view of courts across the country on the interpretation of the phrase, 'intended,' is that 'the insured must have intended both the act and to cause some kind of injury or damage.' I respectfully submit we should follow that view in this traffic case."

The dissent's position is out of step with the test adopted in *Bell* and followed in *Harris*. Further, the dissent's position runs counter to this court's duty to follow Supreme Court precedent. This court is duty bound to follow Kansas Supreme Court precedent, absent some indication that the court is departing from its previous position. *Noone v. Chalet of Wichita*, 32 Kan. App. 2d 1230, 1236, 96 P.3d 674, *rev. denied* 278 Kan. 846 (2004). The dissent offers no authority which would indicate that our Supreme Court has shifted from the "natural and probable consequences" test to the majority approach. Absent any indication that our Supreme Court has moved towards the majority approach, we must follow the "natural and probable consequences" test that our Supreme Court adopted in *Bell*.

Applying the *Bell* test to this case, we determine that Gutierrez' purposeful conduct in driving a car at speeds of 100 m.p.h. in an attempt to elude police precluded coverage in this matter. Gutierrez' volitional conduct of speeding in an attempt to elude police was virtually certain to lead to injury or loss. Moreover, the injury or loss in this wreck was not "unexpected."

The dissent, however, characterizes Gutierrez' conduct as essentially that of someone who exceeded the speed limit while driving. In support of this characterization, the dissent compares this case to two examples:

(1) "I find little difference in this case and one where a person intentionally consumes alcohol to the point of intoxication, intentionally gets into his or her car in an impaired condition, and then drives recklessly and causes an accident that in turn results in injury or death to another." and (2) "Nor do I find much distinction between this case and a situation where a person late for work intentionally runs a red light at a busy intersection during morning rush hour in order to make up time and strikes a vehicle broadside causing injury or death to another."

After making these comparisons, the dissent reasons as follows:

"As mentioned above, in either case, one could argue in one sense, that the injuries were the natural and probable result of the intentional acts of the drivers, in the

first case driving while drunk and in the second case in running a red light at a busy intersection at rush hour. It could be argued that a vehicle crash or collision would be foreseeable and expected whenever a person commits such acts. Yet we invariably view such cases as negligence cases or perhaps gross, wanton, and reckless cases. However, I know of no Kansas decisions that preclude coverage in either of these or similar situations under the intentional act exclusion or because a wreck under these circumstances did not fall within the definition of an accident under a liability policy."

The strength of the dissent's analogical argument depends on the importance of the resemblance of the dissent's two examples to the facts of this case. The similarities must be essential and the differences unessential.

To the contrary, the differences in the key facts in the dissent's two examples are significant. In the dissent's two examples, each lacks the crucial facts present in this case: Gutierrez' flight from the police and the police in hot pursuit of her. Because these significant differences are overlooked in the dissent's two examples, the dissent's analogical argument is questionable. As a result, no proper analogy can be drawn between the dissent's two examples and this case.

Finally, the dissent asks these questions:

"[I]f we conclude that intentionally speeding bars coverage here, will it always do so or just sometimes? If just sometimes, we must then ask at what level of a driver's intentional speed do we conclude that death and injury are a probable and foreseeable result that precludes coverage? . . . Would it be a speed of 40, 60, 70, 90, or 100 m.p.h.?"

These questions suggest a slippery slope argument. The fallacy in the slippery slope is the assumption that once something gets started there is no stopping. Nevertheless, intentional act questions are decided on a case-by-case basis. Moreover, the type of conduct that is sufficiently volitional to bar coverage is highly fact-based. Consequently, this slippery slope argument is not logically relevant to the resolution of this case.

Although we could not find a case specifically on point with this case, we found at least one court that has considered the issue of whether fleeing from police while driving a car was sufficiently intended to preclude coverage under the intentional act provision

of a car insurance policy. In *Nationwide Mut. Ins. Co. v. Finkley*, 112 Ohio App. 3d 712, 679 N.E.2d 1189 (1996), 16-year-old Stembridge, who did not have a driver's license, and his friends went joyriding in a van stolen from Stembridge's grandmother. When officers attempted to pull over Stembridge, Stembridge fled in the van. While trying to elude the police, Stembridge failed to stop at a stop sign and crashed into another automobile. Nationwide Mutual Insurance Company filed a declaratory judgment action, claiming that there was no coverage for the accident. The automobile insurance policy excluded: " 'Property damage or bodily injury caused intentionally by or at the direction of an insured, including willful acts the result of which the insured knows or ought to know will follow from the insured's conduct.' " 112 Ohio App. 3d at 715. The trial court later granted summary judgment to Nationwide, determining that the acts in question came within the "intentional acts" exclusion contained in the automobile insurance policy issued to Stembridge's grandmother.

On appeal, the Ohio Court of Appeals affirmed the trial court's decision, holding that "where an insured willfully and purposefully attempts to elude the police in an automobile chase through an urban area in reckless disregard of traffic control devices, his actions are substantially certain to result in injury." 112 Ohio App. 3d at 715. The Ohio Court of Appeals noted that the added fact that a person does not have a driver's license only strengthens such a conclusion. In determining that coverage was excluded in that case, the Ohio Court of Appeals stated that "Stembridge willfully committed acts which he, at the very least, ought to have known were substantially certain to cause injury." 112 Ohio App. 3d at 715-16.

Although the *Finkley* court did not apply the natural and probable consequences test, the test that the *Finkley* court applied was more favorable for coverage than the natural and probable consequences test. Yet, the *Finkley* court determined that the volitional act of eluding police through an urban area in reckless disregard of traffic control devices was substantially certain to result in injury. The *Finkley* court also relied on the Ohio Supreme Court

decision in *Gearing v. Nationwide Ins. Co.*, 76 Ohio St. 3d 34, 39, 665 N.E.2d 1115 (1996), noting that

" '[i]n those cases where an intentional act is substantially certain to cause injury, determination of an insured's subjective intent, or lack of subjective intent, is not conclusive of the issue of coverage. Rather, an insured's protestations that he "didn't mean to hurt anyone" are only relevant where the intentional act at issue is not substantially certain to result in injury.' " 112 Ohio App. 3d at 715.

Turning our attention now to the facts of this case, we note that Reyes' deposition testimony showed that the loss or injury was foreseeable and substantially certain to occur. In its response to the plaintiffs' summary judgment motion, Benchmark cites to Reyes' deposition testimony that Gutierrez was driving 100 m.p.h. "down Shawnee Drive all the way down to Maplehill Cemetery" where the wreck occurred. Earlier in his testimony, Reyes indicated that when Gutierrez exited off the interstate onto Shawnee Drive, Gutierrez pulled into the lane of oncoming traffic and then failed to stop at the end of the exit ramp before entering Shawnee Drive. Gutierrez then drove down Shawnee Drive, which was a two-lane road, until the wreck occurred at Maplehill Cemetery. Reyes indicated that the wreck occurred when Gutierrez, who was traveling 100 m.p.h., bottomed out at an intersection marked by a stop sign. Reyes explained how the wreck occurred:

"[Q:] What intersection now, Shawnee and what?
"[A:] Shawnee and 47th.
"[Q:] She was going 100 miles an hour through that intersection?
"[A:] Yeah. We was flooring it all the way down until I told her—my last words to everybody in the car was we're going to bottom out once we hit the stop sign.
"[Q:] At what intersection?
"[A:] That's 47th—I think it's 38th, I think. 38th and Shawnee Drive.
"[Q:] 38th and Shawnee Drive? Okay.
"[A:] And I thought we were going to bottom out and the next thing I know we bottomed out the car, slides—bottoms out and comes my way and really starts going backwards. And we hit the ditch and popped up . . . ."

Reyes' testimony establishes that Gutierrez was traveling at 100 m.p.h. on a two-lane road in reckless disregard of traffic control signs while attempting to elude police officers. It is clear that under such circumstances, Gutierrez' conduct was substantially certain to result in injury. Because the loss or injury was foreseeable and

substantially certain to occur, such loss or injury was barred under the intentional act exclusion of Gutierrez' policy.

For the above reasons, we reverse based on the intentional act exclusion of Benchmark's insurance policy. Although it is unnecessary for us to address Benchmark's illegality defense argument based on our decision, we, however, will address it briefly.

*Illegality defense*

The trial court based its entry of summary judgment in favor of the plaintiffs solely on its rejection of Benchmark's reliance on the illegality defense. Benchmark challenges the trial court's decision in this regard, arguing that the criminal conduct of Gutierrez, Sanchez, and Reyes bars recovery.

Kansas adheres to the general rule that an insurance policy violates public policy and is, therefore, void if it is intended to indemnify an insured against liability for his or her criminal acts. *Guaranty Nat. Ins. Co. v. McGuire*, 173 F. Supp. 2d 1107, 1110 (D. Kan. 2001). Public policy defenses to payment of such claims have been developed by courts. One of those defenses is the illegality defense. In explaining the illegality defense, which if successfully made bars indemnification of those individuals who cause a loss by their criminal conduct, this court stated:

"The illegality defense is based on the principle that a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act. The defense will be applied to bar recovery if the evidence shows that the plaintiff freely and voluntarily consented to participate in the illegal act, without duress or coercion. [Citations omitted.]" *Parker v. Mid-Century Ins. Co.*, 25 Kan. App. 2d 329, 331-32, 962 P.2d 1114 (1998).

Benchmark argued that both Sanchez and Reyes consented to and even participated in a series of illegal acts beginning with their actions at the pub and culminating with Gutierrez fleeing and eluding the police officer. Benchmark maintained that the criminal conduct of all three occupants of the car, both collectively and individually, was "a substantial factor in bringing about the wreck." Accordingly, Benchmark asserted that the illegality defense barred recovery.

Preliminarily, it bears noting that Reyes, who was the only survivor, was never charged with any crime associated with the events at issue.

The trial court, in elaborating on its rationale for rejecting Benchmark's illegality defense, stated:

"[I]t seems clear to me that the illegality defense—defense cannot apply to any of the criminal conduct involved in this case except for the eluding a police officer. Everything is too intonated [*sic*] in time and space to the accident that resulted in the fatality and the injuries.

"As to the attempting to elude, there is no evidence that Renee [*sic*] Thomas or the heirs of Ramon Sanchez that there would be any—with regard to them, there's no evidence, or there's no way the Court can conclude that—that they affirmed the actions of the driver or participated in the attempt to elude in any fashion except perhaps not availing themselves of an opportunity to exit the vehicle. But that certainly would not allow the illegality defense to apply. It might be a question of comparative negligence if you tried the negligence aspect of this case. But I always thought that getting in with a drunk driver was comparative negligence, but it's not a defense to—to the insurance policy.

"Now, with regard to Mr. Reyes, I reread those things that [Benchmark's counsel] referred me to also. And they—they do not appear to me to indicate he acted as a lookout or encouraged in any way the attempt to elude. Attempting to elude as a crime began when they stopped for the officer, and the officer approached, and they sped off. That's when that crime began. And things else before that, they're intonated [*sic*] in time and space."

As the trial court expressed, any causal connection between the events at the pub and the wreck was simply too tenuous in light of the intervening events and passage of time. Granted, one of the crimes to which Benchmark points, fleeing or attempting to elude a police officer, had the *potential* of supporting application of the illegality defense, given its apparent proximity in time to the wreck. Nevertheless, such a proposition fails upon an examination of the elements of that crime and a review of the record.

First, Benchmark incorrectly asserts that the crime of fleeing or eluding began once Gutierrez drove away from the pub. As the plaintiffs point out, the crime requires a pursuing police officer to give a visual or audible signal to bring the car to a stop. K.S.A. 8-1568(a). See PIK Crim. 3d 70.09 (identifying elements of fleeing or attempting to elude police officer). Here, that crime could have

occurred only after Gutierrez drove off after the officer had stopped her.

Moreover, a review of the police department records, and Reyes' statement in particular, confirms that neither Reyes nor Sanchez were willing participants in that crime as Benchmark suggests. Reyes maintained that he told Gutierrez *not* to drive away. Obviously, because Reyes was the sole survivor of the wreck, nothing in the police records contradicted Reyes' account of what was said inside the car. In addition, Benchmark deposed Reyes as part of discovery, and Reyes maintained that neither he nor Sanchez told Gutierrez to drive off. In fact, Reyes testified that he told Sanchez they could just let the police take them to jail and they could get out the next day. Gutierrez then drove off.

Keeping in mind this court's duty to resolve all inferences reasonably drawn from the evidence in favor of Benchmark, there still is no indication that Sanchez or Reyes consented to Gutierrez' decision to flee from the officer. To this end, contrary to Benchmark's repeated assertion, Sanchez and Reyes' failure to exit the car on the shoulder of the highway does not demonstrate their consent or willingness to participate in Gutierrez' decision to flee.

In advocating the application of the illegality defense, Benchmark relies heavily on *Parker*. In *Parker*, John Hurt was one of several friends who drank alcohol, left a juvenile offender facility without permission, and stole a car. Police pursued them, and a high-speed chase ensued. The driver eventually lost control of the stolen car, striking a utility pole and killing Hurt, who was a passenger. Colleen Parker, Hurt's mother and sole heir, sued her car insurer under the policy on her own car (which was not involved in the accident), seeking damages for the death of Hurt through the policy's uninsured motorist coverage and personal injury protection benefits. The trial court entered summary judgment in favor of the insurer, and Parker appealed.

The *Parker* court held that Parker did not have compensable damages because Hurt would not have been able to assert a claim for damages under Parker's insurance policy had he survived the accident. 25 Kan. App. 2d at 331-34. In doing so, the *Parker* court noted that the intention of mandated uninsured and underinsured

motorist coverage is to provide recompense to an innocent person damaged through the wrongful conduct of a motorist who cannot be made to respond in damages because he or she is uninsured or underinsured and not financially responsible. Viewing the facts of the case within this context, the *Parker* court then stated: "In our case, the purpose of the illegality provision would be defeated if an heir of one of the parties involved in the car theft would be allowed to collect from the insurer through a wrongful death action for the illegal acts of a co-malefactor. [Citation omitted.]" 25 Kan. App. 2d at 333.

As the plaintiffs correctly point out, *Parker* is distinguishable from the circumstances presented here. In *Parker*, Hurt actively participated in stealing the car and presumably continued to commit a crime by riding in the car, given his knowledge that the driver lacked permission to use the car. See K.S.A. 2005 Supp. 21-3705(a) (identifying crime of criminal deprivation of property); K.S.A. 21-3205 (prescribing liability for crimes of another, that is, aiding and abetting).

The *Parker* court relied on the Virginia Supreme Court decision in *Lee v. Nationwide Mutual Insurance Co.*, 255 Va. 279, 497 S.E.2d 328 (1998). In *Lee*, Roy J. Lee, a minor, was a passenger in a stolen car. Lee was severely injured when the driver lost control of the car, and the car wrecked. Lee's mother sued for his injuries. Nationwide Mutual Insurance Company, the mother's uninsured motorist carrier, defended the action, asserting a defense of illegality. The trial court determined as a matter of law that the defense of illegality barred the mother's claim for damages to her son. Lee was 13 years old when the accident occurred. On appeal, Lee argues that the trial court erred when it failed to apply a rebuttable presumption that a person between the ages of 7 and 14 was incapable of consenting to an illegal act.

The *Lee* court explained that before an illegality defense will be applied, the defense must show that the plaintiff committed an illegal act. Moreover, the defense must prove that the plaintiff consented to the commission of the illegal act and engaged in it freely and voluntarily, without duress or coercion. The *Lee* court determined that Lee freely and voluntarily, without duress or coercion,

consented to his participation in the theft of the car. The *Lee* court found that Lee had actively planned to take his girlfriend's mother's car and had referred to the plan as stealing the car when talking to his girlfriend. Lee told his girlfriend to take the keys to her mother's car. Lee locked his bedroom door to avoid detection, and he left his home through his bedroom window. He turned the keys over to William R. Slate, a 16-year-old friend. Lee pushed the car away from his girlfriend's mother's house to avoid detection. According to his girlfriend's testimony, Lee never tried to stop Slate, alter the way Slate was driving, or get out of the car. The *Lee* court concluded "that reasonable persons could not disagree that Lee consented to his participation in an illegal act and that the illegality defense barred his recovery for injuries sustained as a result of that illegal act." 255 Va. at 285.

Although Benchmark correctly points to *Parker* as an authoritative application of the illegality defense, it ignores crucial differences between the facts of that case and of the present situation. In contrast to *Parker* and *Lee,* the record here does not show that either Sanchez or Reyes freely and voluntarily consented to participating in fleeing or eluding the officer, without duress or coercion. Instead, the uncontroverted evidence was that Sanchez and Reyes actively opposed Gutierrez' illegal conduct. The record before this court could not support an illegality defense based upon Gutierrez' conduct of fleeing and eluding police.

Furthermore, even looking back to earlier events that night, it is apparent that Sanchez' actions in firing a gun at the pub, while undeniably criminal in nature, could not support application of the illegality defense. Benchmark has failed to show that the damages were a result of Sanchez' illegal act of firing the gun.

Reversed.

BUKATY, J., concurring in part and dissenting in part: I agree with the majority's conclusion that the illegality defense proffered by Benchmark does not preclude coverage to plaintiffs for the acts of Benchmark's insured, Melissa Gutierrez. I respectfully dissent, however, from the majority's conclusion that Gutierrez' conduct was not a covered accident under her policy. I further disagree that

the intentional act exclusion of the policy precludes coverage to plaintiffs under the facts presented here. This is not a case of a tortfeasor intending to do harm to another person as are the Kansas cases cited by the majority that excluded coverage. Perhaps there is comparative fault on the part of Sanchez and Reyes, but that does not preclude coverage to them for the negligent or reckless speeding by Gutierrez.

As the majority notes, the case of *State Farm Fire & Cas. Co. v. Falley,* 23 Kan. App. 2d 21, 28, 926 P.2d 664 (1996), *rev. denied* 261 Kan. 1086 (1997), held that the intentional act exclusion of a liability insurance policy precluded coverage for injury and damages which are "natural and probable consequences of the insured's intentional act." It strikes me, however, that if we apply that principle to bar coverage under the facts here, a logical extension of the application would be that no liability coverage would exist any time a driver knowingly or intentionally violates a traffic law whether it is speeding, improper turning, running a stop sign, crossing a center line, etc. In any of these situations, an insurer would argue that serious injury or death is a natural and probable result if the driver intentionally drives in such a manner. This argument would logically follow from the premise that we have traffic laws and "rules of the road" in order to prevent accidents, injuries, and death. My review of the facts of *Falley* and other Kansas cases cited by the majority lead me to the conclusion that the "natural and probable consequences" test does not preclude coverage for plaintiffs' injuries in this case.

In *Falley*, an automobile insurer sought a declaratory judgment regarding injuries sustained by a victim who fell off the hood of Falley's car. It was undisputed that Falley intentionally drove his car with the victim spread-eagle on the hood. There was controversy as to whether Falley simply slowed his car or slammed on the brakes. Although the *Falley* court held the exclusionary clause precluded coverage for any injury which was the natural and probable consequence of the insured's intentional act, this court, nonetheless, held that a material question of fact remained as to whether the victim's injuries were caused by or "arose from" Falley's intentional act of driving with the victim on the hood. Accordingly, this

court reversed the district court's entry of summary judgment in favor of the insurer and remanded for a further factual determination as to whether the victim's injuries were caused by Falley's intentional act of driving with the victim on the hood. 23 Kan. App. 2d at 29.

It seems to me much more plausible to infer that the driver intended to injure a person if the driver operated his or her vehicle knowing the person was on the hood of the car and does so in a manner likely to throw the person off *(Falley)*, than it is to infer an intent to injure from the act of speeding even if done in a reckless manner.

The only relevant evidence in this case of Gutierrez' intent was that she intended to speed. Nowhere in the record is there evidence to suggest she intended to lose control of her vehicle or to injure or kill anyone much less herself. Granted, she perhaps was intending to elude police, but the reason she was speeding should not be material in construing the intentional act exclusion of the policy as it might be in determining the merits of the illegality defense offered by Benchmark. The reason one is speeding recklessly does not make it any more foreseeable that a wreck will occur nor does it render the wreck any more "expected or intended" than the speeding itself.

In *Bell v. Tilton*, 234 Kan. 461, 472, 674 P.2d 468 (1983), the Supreme Court held that despite the insured's statement that he did not intend to injure the eye of the victim (his friend), the intentional act exclusion of his policy precluded coverage for the injury, since there was evidence that the insured did intend to hit the victim with a BB pellet. There apparently was no question about that. Again, in the present case, no direct evidence existed that Gutierrez intended to lose control of her vehicle or to harm anyone.

In *Harris v. Richards*, 254 Kan. 549, 867 P.2d 325 (1994), the Supreme Court held the intentional act exclusion barred coverage to a victim who was sitting in a truck and was injured by shotgun pellets fired intentionally into that truck by the tortfeasor who knew the truck was occupied even if the tortfeasor had no intention to

shoot or injure the victim. There was an abundance of evidence to suggest the tortfeasor intended to injure someone.

In *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403 (1973), a case discussed in both *Falley* and *Harris*, the insured garage had performed work on the victim's car. The victim drove the car home without paying for the services rendered. Employees of the insured subsequently recovered the car, prompting the victim to drive to the garage in his truck, park his truck there, and then enter his car and drive it home. When the victim later returned to retrieve his truck, he saw employees of the insured towing it away. The victim's foot was run over during his apparent efforts to stop the employees from towing his truck. Our Supreme Court held the intentional act exclusion did not preclude coverage, stating: "[T]he act of taking possession of the truck, although intentional, was not the act which caused [the victim's] personal injury. If liability for personal injury attached it was caused by the manner in which the employees were moving the truck." 212 Kan. at 687. The court appeared to find that an intervening event took place between the intentional taking of the truck by garage personnel and the injury to the victim, namely, the manner in which the personnel were moving the truck.

As stated before, the evidence here establishes that the last intentional act performed by Gutierrez before the wreck was her speeding, which she apparently did in a very reckless manner. Then another event occurred, namely, the loss of control of the vehicle which then caused the death of two occupants and injury to another. This is a different factual scenario than that presented in the first three cases discussed above. In *Falley*, the tortfeasor drove his vehicle with a person on the hood. In *Bell*, the tortfeasor aimed and shot a BB gun toward the victim. In *Harris*, the tortfeasor aimed and shot his shotgun at the truck in which the victim was sitting. In these cases, there was no event between the intentional act of the tortfeasors and the injury to the victims. The situation in *Spruill* more closely parallels the facts here in that another event occurred between the intended act of the alleged tortfeasor and the victim's injury, namely the operation of the truck in a manner that led to injury to the victim. The *Spruill* court held that the

intentional act exclusion did not preclude coverage in such a situation. 212 Kan. at 686.

I find little difference in this case and one where a person intentionally consumes alcohol to the point of intoxication, intentionally gets in his or her car in an impaired condition, and then drives recklessly and causes an accident that in turn results in injury or death to another. Nor do I find much distinction between this case and a situation where a person late for work intentionally runs a red light at a busy intersection during morning rush hour in order to make up time and strikes a vehicle broadside causing injury or death to another. As mentioned above, in either case, one could argue in one sense, that the injuries were the natural and probable result of the intentional acts of the drivers, in the first case driving while drunk and in the second case in running a red light at a busy intersection at rush hour. It could be argued that a vehicle crash or collision would be foreseeable and expected whenever a person commits such acts. Yet we invariably view such cases as negligence cases or perhaps gross, wanton, and reckless cases. However, I know of no Kansas decisions that preclude coverage in either of these or similar situations under the intentional act exclusion or because a wreck under these circumstances did not fall within the definition of an accident under a liability policy.

Finally, it appears from the witnesses, including Reyes, that the vehicle was traveling at varying speeds during the moments leading up to the wreck. When Officer McLauglin, the first to give pursuit, initially saw the car, it was going in excess of 80 m.p.h. on Interstate 35 and then 45-60 m.p.h. when it exited onto Interstate 635. Reyes stated in his deposition the car was going 100 m.p.h. on Shawnee Drive just before flipping. Yet a witness who saw the car on Shawnee Drive a few blocks before the wreck, estimated it was going 35 or 45 m.p.h. or faster. Another witness who saw the wreck in his rear-view mirror stated only that the car was speeding. If we conclude that intentionally speeding bars coverage here, will it always do so or just sometimes? If just sometimes, we must then ask at what level of a driver's intentional speed do we conclude that death and injury are a probable and foreseeable result that precludes coverage? Or at what level is the wreck no longer "unex-

pected and unintended" and then no longer a covered accident under the policy? Would it be a speed of 40, 60, 70, 90, or 100 m.p.h.? The majority suggests that the fact Gutierrez was eluding an officer is a significant factor here. Would it be significant if she was going only 10 or 15 miles over the speed limit in her attempt to elude? I submit these are questions better left unasked due to the confusion and additional litigation that would result in attempting to answer them.

The majority opinion acknowledges that the majority view of courts across the country on the interpretation of the phrase, "intended," is that "the insured must have intended both the act and to cause some kind of injury or damage." I respectfully submit we should follow that view in this traffic case.

For the foregoing reasons, I would affirm the district court.