(327 P.3d 1014)
No. 106,721

TINA D. FOSTER, *Appellee*, v. STONEBRIDGE LIFE INS. COMPANY, *Appellant*.

—

2

Opinion filed December 21, 2012.

*Curtis L. Tideman,* of Lathrop & Gage LLP, of Overland Park, and *Rebecca J. McMahon,* of the same firm, of Kansas City, Missouri, for appellant.

*David A. Hoffman* and *Donald W. Vasos,* of Vasos Law Offices, of Fairway, for appellee.

Before GREEN, P.J., MARQUARDT, J., and BRAZIL, S.J.

BRAZIL, J.: This appeal arises out of a claim made under an accidental death insurance policy. The ultimate issue is whether the insured's accident was the proximate cause of her death. Marie Foster, the insured, tripped over a curb, fell, and broke her hip on August 1, 2009. On August 2, she had hip surgery, and on August 3, she died after suffering cardiac arrest. Marie's daughter, Tina Foster, made a claim for benefits under Marie's accidental death

policy issued by Stonebridge Life Insurance Company, which Stonebridge denied because it found that Marie's death was not due to bodily injury. Foster filed suit against Stonebridge, and the district court ultimately entered judgment in favor of Foster for the policy's accidental death benefits and for attorney fees under K.S.A. 40-256. Stonebridge challenges the district court's rulings at summary judgment and trial.

We affirm and grant Foster's motion for appellate attorney fees in the amount of $46,857.50, but we deny her request for costs in the amount of $504.79.

Marie held an accidental death insurance policy issued by Stonebridge Life Insurance Company with an effective date of May 1, 1991. The policy provided accidental death and dismemberment benefits of $40,000.

On August 1, 2009, Marie accidentally fell outside of her home and suffered a hip fracture, also known as an intertrochanteric femoral fracture. She was transported by ambulance to Shawnee Mission Medical Center, and on August 2, 2009, she had hip surgery. After surgery, Dr. Wade Williams noted that Marie had increasing hypoxia, which Williams initially suspected may be due from over sedation, but she received Narcan and remained hypoxemic. Dr. Williams also noted that Marie had findings of atelectasis/infiltrate in the lower lobes and it was possible Marie aspirated during surgery. "Atelectasis" means "[d]ecreased or absent air in the entire or part of a lung, with resulting loss of lung volume." Stedman's Medical Dictionary 161 (27th ed. 2000). "Aspirate" means "[t]o inhale into the airways foreign particulate material, such as vomitus." Stedman's Medical Dictionary 156 (27th ed. 2000). Marie was transferred to the intensive care unit.

Marie had a myocardial infarction at approximately 9 p.m. on August 2, the day of her surgery. Approximately 3 hours after her surgery, Marie's saturation of partial pressure of oxygen (SpO2) rate was 49, which is considered an indicator of aspiration, and she had a drop in hemoglobin. She also had an increase in troponin, a cardiac enzyme used by emergency room doctors to look for evidence of heart attack, and ST elevation on an EKG, both cardiac complications. Orthopedic surgeon Dr. John Pazell, the plaintiff's

expert witness, testified that these conditions would cause the heart to function abnormally because it would not be getting the proper amount of oxygen.

On August 3, 2009, Marie was taken to the cardiac catheterization lab and was being prepped for cardiac catheterization and coronary angiography when she coded. Marie died at 12:20 p.m.

At the time of Marie's fall and death 2 days later, all premiums due under the policy were paid and the certificate of insurance was in full force and effect. Following Marie's death, Tina Foster, Marie's beneficiary and the plaintiff in this lawsuit, made a claim for the policy proceeds.

Since Foster filed her claim for benefits, the issue in this case has been whether under the accidental death policy Marie's fall resulted "directly and independently of all other causes," as required by the policy. This factual debate has centered on Marie's preexisting heart conditions.

The documents in Marie's insurance claim file contained conflicting opinions on the cause of death. The certificate of death completed by Dr. Lawrence Dall listed the manner of death as "natural" and the immediate cause of death as cardiac arrest due (or as a consequence of) myocardial infarction. On the other hand, the proof of death—the attending physician's statement completed by Dr. Thomas Snodell, Marie's general practitioner, listed the primary cause of death as "fall" and the secondary or contributory cause of death as "cardiac arrest."

On November 9, 2009, Shryl Clark, a technical claims specialist for Stonebridge, sent a letter to Dr. Dall, the pronouncing and certifying physician on the death certificate, asking Dr. Dall additional questions about Marie's death. Specifically, Clark asked Dr. Dall if Marie's injuries from her fall caused her myocardial infarction and cardiac arrest and if any of the injuries Marie suffered as a result of her fall were the proximate cause of her death. Dr. Dall answered "no" to both questions.

On December 21, 2009, Marie's claim was sent to Stonebridge's legal department because Foster had an attorney involved in her benefits claim. On December 24, 2009, Clark recommended denying Foster's claim for benefits, and claims manager Lauraann

Allen followed Clark's recommendation and sent the denial letter Clark drafted to Foster's attorney.

On February 16, 2010, Foster filed this lawsuit against Stonebridge asking for the policy benefits, reasonable attorney fees, and costs. Stonebridge filed a motion for partial summary judgment on attorney fees, which the court denied. Stonebridge then filed a renewed motion for summary judgment on coverage and attorney fees. The court denied the motion, and the case proceeded to a bench trial.

The trial judge found that Marie's death was covered under the policy and that Stonebridge's denial was "without just cause or excuse" and, therefore, ordered Stonebridge to pay Foster attorney fees and costs of $41,182.65 pursuant to K.S.A. 40-256. Stonebridge timely appeals.

## ANALYSIS

*Denial of Stonebridge's renewed motion for summary judgment on the coverage issue*

This court's standard of review for a district court's grant or denial of a motion for summary judgment is well established:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Miller v. Westport Ins. Corp.*, 288 Kan. 27, Syl. ¶ 1, 200 P.3d 419 (2009).

To the extent this court must interpret the certificate of insurance in resolving this question, insurance contract interpretation is a question of law. *Iron Horse Auto, Inc. v. Lititz Mut. Ins.*, 283 Kan. 834, 838-39, 156 P.3d 1221 (2007).

Stonebridge argues that its renewed motion for summary judgment should have been granted on the coverage issue because Foster presented no evidence creating a genuine issue of material fact as to whether Marie's death resulted directly and independently from her August 1, 2009, fall. This argument requires an understanding of the policy language at issue.

Regarding the burden of proof, because Foster sought to recover under the general provisions of the policy, not an exclusion, she had the "burden of proving the injury was of a type included in the general provisions of the insurance contract." *Clardy, Administrator v. National Life & Accident Ins. Co.*, 1 Kan. App. 2d 1, 5, 561 P.2d 892 (1977); see *Kansas Farm Bureau Ins. Co. v. Reynolds*, 16 Kan. App. 2d 326, 329-30, 823 P.2d 216 (1991).

The policy provides in relevant part:

"If a Covered Person is:
1. Injured in an accident not covered under Part I or Part II; and
2. not otherwise excluded in the policy, we [Stonebridge] will pay the applicable benefit specified in Part III of the Schedule of Insurance for the appropriate Loss as shown in the Schedule of Losses and Benefits below."

The definitions section of the policy defines "injured" as "having suffered an injury."
"Injury" is defined as

"bodily injury caused by an accident occurring while the insurance is in force resulting:
1. within 365 days after the date of the accident; and
2. *directly and independently* of all other causes,
in any Loss covered by the policy." (Emphasis added.)

Stonebridge argues that there was no genuine issue of material fact as to whether Marie's death resulted directly and independently from her August 1, 2009, fall. Stonebridge argues that under *Boring v. Haynes*, 209 Kan. 413, 496 P.2d 1385 (1972), because Marie's heart condition was chronic, not dormant, Foster could not show that Marie's fall aggravated or activated a dormant disease. Therefore, Foster did not present facts sufficient to meet her burden of proof.

Foster argues that the district court correctly denied summary judgment under the "directly and independently" clause because

the court had before it Dr. Snodell's statement that Marie's fall was the cause of her death, evidence showing that Marie's fall was the cause of her death, and pre-fall medical records showing that Marie's heart was functioning normally. Further, Foster argues that the district court found that Dr. Pazell's testimony that Marie's heart was asymptomatic was synonymous with "dormancy."

In ruling on the renewed motion for summary judgment coverage issue, the district judge found:

> "Both parties know I must look at the evidence in favor of the plaintiff. As such, the court's going to deny the summary judgment motion as to the cause of action based on *Boring* and based on the disputed facts.
>
> "In Pazell's deposition alone, the doctor talks about that the patient was not in congestive heart failure. That's on page 16. He gives a conclusion that—on page 23—if she hadn't broken her hip, she wouldn't have had surgery and anesthesia. She wouldn't have had post-op complications, et cetera. On page 25 is if she would have been having cardiac problems, they would not have cleared her for surgery. That she was asymptomatic, which in the court's mind can mean dormancy. Although the doctor may not want to give an opinion as to dormancy, he did say she was asymptomatic; that the strain on the heart caused by the fracture a fact, not speculation; and if she had not had the surgery, she would have bled to death."

The district court's findings of fact about Dr. Pazell's deposition are supported by substantial competent evidence in the record. Stonebridge argues, however, that Foster presented no evidence that the fall aggravated or activated a dormant disease as required under *Boring*. But it is clear the district court found that Foster presented evidence supporting a finding that Marie's heart problems were dormant. *Boring* defined "dormant disease" as " 'one which is quiescent, passive, resting, or static as opposed to one which is active, lively, or effective.' " 209 Kan. at 421. Here, the district court found asymptomatic was synonymous with dormancy. "Asymptomatic" is defined as "neither causing nor displaying symptoms." Webster's II New College Dictionary 70 (2001). The district court did not err in finding these terms were synonymous and denying Stonebridge's renewed motion for summary judgment.

Further, although the district court stated the following findings in ruling on the renewed motion for summary judgment attorney fee issue, they are relevant to the coverage issue as well. The court

found: "It appears to the court that [Stonebridge's employees] relied solely on Dr. Dall's opinion to the exclusion of all other evidence. There was conflicting evidence as to the cause of death."

This finding is also supported by substantial competent evidence. Dr. Dall's opinion and Dr. Snodell's opinion stated different causes of death. Dr. Dall, the physician who completed the certificate of death and the questionnaire created· by Clark stated that the manner of death was natural and that immediate cause of death was cardiac arrest due to myocardial infarction. In contrast, the proof of death—the attending physician's statement filled out by Dr. Snodell stated that the·primary cause of death was Marie's fall and the secondary cause of death was cardiac arrest.

The district court did not err in finding that there was conflicting evidence as to the cause of death which precluded summary judgment. Stonebridge attempts to bolster its argument with testimony from Foster's expert at trial; however, this testimony was not before the court when it ruled on the renewed motion for summary judgment. Therefore, at the time the district court ruled on Stonebridge's renewed motion for summary judgment, the facts were disputed as to the proximate cause of Marie's death, and the district court did not err in denying Stonebridge's renewed motion for summary judgment.

*The court's final judgment*

Stonebridge next challenges the district court's final judgment. An appellate court reviews the trial court's findings of fact to determine if the findings are supported by substantial competent evidence and are sufficient to support the trial court's conclusions of law. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). Substantial competent evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. *Hodges*, 288 Kan. at 65. An appellate court has unlimited review of conclusions of law. *American Special Risk Management Corp. v. Cahow*, 286 Kan. 1134, 1141, 192 P.3d 614 (2008). To the extent this court must interpret the certificate of insurance in resolving this question, insurance contract interpretation is a question of law. *Iron Horse Auto*, 283 Kan. at 838-39.

Before reaching the parties' arguments, it is important to understand the disputed issue at trial and on appeal. In determining whether Marie's fall was covered under the accidental death policy, there was no dispute that Marie's fall was accidental, that Marie suffered a bodily injury from the fall, or that her death occurred with 365 days of the accident. The only disputed question is whether her death resulted from a bodily injury caused by an accident resulting "directly and independently of all other causes" as required by the policy.

*Did the district court err in not making any findings about the state of Marie's preexisting heart condition at the time of her accident?*

Stonebridge first argues that the district court erred because the final judgment's findings of fact and conclusions of law did not find that Marie's heart condition was dormant and that her fall activated or aggravated the condition as required for Foster to recover under *Boring*, which Stonebridge argues is the controlling authority in this case. In *Boring*, our Supreme Court adopted the following rule:

"In the event an insured sustains physical disability or death resulting from an accidental injury which aggravates or causes a dormant disease or ailment to become active, the disability or death will be regarded as having been caused solely by the injury, so as to render an insurer liable therefor under an accident policy, even though such disability or death might later have resulted regardless of the accident, and even though the accident might not have affected a normal person to the same extent." *Boring*, 209 Kan. 413, Syl. ¶ 3.

Stonebridge argues that under *Boring*, as a matter of law, Foster must show that Marie's heart condition was dormant. Stonebridge argues the evidence did not support a finding that Marie's heart condition was dormant; therefore, the district court erred in ruling in Foster's favor. But Foster argues that *Boring* does not control because Marie's preexisting condition did not play a role in her death. Unfortunately, from the district court judge's ruling, it is unclear whether she found that Marie's preexisting heart condition played a role in her death because the judge never explicitly addressed this finding on the record or in her written findings. The district court found on the record:

"[T]he court is going to find that based on the facts presented, the evidence presented, the court finds that the proximate cause of Ms. Foster's death was the fall and fracture and that the plaintiff died—Ms. Foster died as a result of an accident that caused a hip fracture which required surgery, which caused post-operative complications resulting in a myocardial infarction."

Further, in the written final judgment the court found in relevant part:

"On September 1, 2009, Marie Foster accidently fell and suffered an intertrochanteric femur fracture. Marie Foster died on September 3, 2009. Under the facts of this case, Marie Foster's death was the result of accidental bodily injury, as defined in the subject accidental death policy issued to Marie Foster by defendant Stonebridge. As a result, there is coverage under the Stonebridge policy for Ms. Foster's death."

Foster actually fell on August 1 and died on August 3, 2009—not in September.

From these rulings, it is clear that the district court addressed the correct ultimate factual issue under Kansas law, that is, whether the fall was the proximate cause of Marie's death. See *Boring*, 209 Kan. at 421; see also, *e.g.*, *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008) (noting that proximate cause is generally a question of fact); 10 Couch on Insurance §§ 141:19 and 141:20 (3d ed. 2005) (noting that whether a preexisting condition precludes recovery is generally a jury question). What is unclear from the final judgment is whether the court found that Marie's fall was the proximate cause under the *Boring* rationale, *i.e.*, a dormant preexisting condition was activated by the accident, or instead found that Marie's preexisting condition was irrelevant to proximate cause in this case.

As Foster points out, the district court invited but did not require the parties to submit proposed findings of fact and conclusions of law. Stonebridge filed a posttrial brief but did not provide the trial court with suggested findings of fact or conclusions of law. Further, Stonebridge did not object to the district court's findings of fact and conclusions of law and, in fact, submitted the final order in conjunction with Foster's attorneys.

"Generally, a litigant must object to inadequate findings of fact and conclusions of law to give the trial court the opportunity to correct them, and in the absence

of an objection, omissions in findings will not be considered on appeal. [Citation omitted.] Where no objection is made, this court will presume the trial court found all facts necessary to support its judgment. . . . [Citation omitted.]" *Dragon v. Vanguard Industries,* 282 Kan. 349, 356, 144 P.3d 1279 (2006).

When the record on appeal does not support such a presumption, however, the appellate court must remand for additional factual findings and legal conclusions. *Dragon,* 282 Kan. at 356. But in this case, the record makes it clear that the district court judge handling this case from its inception was aware of the *Boring* decision and considered it throughout this litigation. For example, in denying the renewed motion for summary judgment, the judge specifically stated that she was denying the motion based on *Boring* and the disputed facts. Therefore, because Stonebridge did not object to the findings and jointly submitted the final order and also because the district court judge was aware of *Boring* and its potential application in this case, we must presume the trial court found all the necessary facts to support her ruling that Marie's fall was the proximate cause of her death.

### Does the policy language exclude coverage for Foster?

Stonebridge substantively argues that the district court's final judgment ruling erroneously found that Marie's death was covered under the policy. Stonebridge argues that Marie's coronary artery disease was not dormant but active and Marie's fall did not aggravate or activate the disease; thus, under *Boring*, Foster cannot prove Marie's death was caused by accident "directly and independently of all other causes," as the policy requires.

Stonebridge's argument on appeal, therefore, implicitly argues that the district court erroneously found that Marie's accident was covered under *Boring* or, stated another way, that Marie's fall aggravated or caused a dormant disease or ailment to become active and affected her differently than a normal person. Because Stonebridge relies on *Boring* to interpret the "directly and independently of all other causes" policy language, it should be noted that the policy language at issue here is different than the policy language at issue in *Boring*.

In *Boring*, our Supreme Court interpreted an accident policy with an exclusion if bodily injury was " 'caused directly or indirectly, wholly or partly . . . by disease.' " 209 Kan. at 414. Here, the language at issue is the definition of "injury" as "bodily injury caused by an accident . . . resulting . . . *directly and independently of all other causes*." (Emphasis added.) But even broadly worded language similar to that used in Marie's policy has not been held to exclude coverage in Kansas. Rather, our Supreme Court has looked to whether the beneficiary can show that " 'an accidental injury aggravates or energizes a dormant disease or physical ailment the accident may be said to have been the proximate cause of the resulting disability within the terms and meaning of the ordinary accident insurance policy,' " as discussed in more detail below. *Boring*, 209 Kan. at 421 (quoting *Williams v. Benefit Trust Life Ins. Co.*, 200 Kan. 51, 55, 434 P.2d 765 [1967]).

Although the "independently of all other causes" language in Marie's policy suggests that no other cause can be in play for the insured to be covered under the policy, similar language has not been interpreted that way by our Supreme Court. In *Williams v. General A. F. & L. Assurance Corp.*, 144 Kan. 755, 756, 62 P.2d 856 (1936), the court interpreted similar policy language where the accident policy insured against " 'the effects resulting *directly and exclusively* of all other causes.' " (Emphasis added.) The court was charged with interpreting the " 'exclusively of all other causes' " language and noted that there are two lines of authorities:

"One line of authorities, upon which appellant relies, construes the language used in the policy to mean that if the insured had any disease or physical ailment, from any cause, at the time of the accidental injury for which he seeks to recover under the policy, and is unable to show clearly that such disease or ailment was not reflected in some degree in the injurious results of the accident, there can be no recovery under the policy. Under these authorities it is practically impossible for any but the physically sound to recover on an accident policy containing the language used, or tantamount to that used, in the policy here involved, and they place the burden on plaintiff to show that the full effect of the injury following the accident was independent 'of any preexisting disease, or bodily infirmity, as a contributing cause thereof.' [Citations omitted.]

"The other line of authorities, recognizing the fact that many persons not physically sound in every respect carry accident insurance policies, take what seems to us a more rational view and construe the language of the policy to mean that

if the accident be shown to be the cause of the injury for which the action is brought plaintiff can recover. [Citations omitted.]" *Williams*, 144 Kan. at 757-58.

Unfortunately, the *Williams v. General* court never directly stated which line of authority it adopted. See 144 Kan. at 757-58. Instead, the court stated that

"[w]ithout passing upon the accuracy of this classification, most of the courts look to the evidence to see whether the accident caused the injury for which the action was brought. Many of the cases use the term 'proximate cause,' as do some of the leading authorities. [Citations omitted.] . . . But, without regard to the characterizing words used, the proper inquiry, and the one usually made, is whether the injury for which suit was brought was caused by the accident." 144 Kan. at 758.

The court found that this was a jury question. 144 Kan. at 758.

In *Boring*, our Supreme Court recognized that *Williams v. General* effectively followed the rule " 'that where an accidental injury aggravates or energizes a dormant disease or physical ailment the accident may be said to have been the proximate cause of the resulting disability within the terms and meaning of the ordinary accident insurance policy.' " *Boring*, 209 Kan. at 421 (quoting *Williams v. Benefit Trust*, 200 Kan. at 55). Therefore, even though the language used in the *Williams v. General* policy, like the language here, seems to only narrowly provide coverage, the language has not been interpreted so restrictively by our Supreme Court. See *Boring*, 209 Kan. at 422 (discussing the general rules applied in *Rankin*); *Rankin v. United Commercial Travelers of America*, 193 Kan. 248, 251, 392 P.2d 894 (1964) (interpreting an accidental death policy under Ohio law where the policy insured against bodily injury " ' "occasioned by the said accident, alone and independent of other causes" ' " and applying general rules for recovery to this type of policy); *McGirr v. Monumental Life Ins. Co.*, No. 71,788, unpublished Court of Appeals opinion filed April 14, 1995, slip op. at 2 (applying *Boring* to determine if a death occurred "independently of any other cause"), *rev. denied* 257 Kan. 1092 (1995); see also *Vakas v. Penn Mut. Life Ins. Co.*, No. 06-1152-WEB, 2007 WL 2789884, at *9-11 (D. Kan. 2007) (unpublished opinion) (interpreting policy language almost identical to the language at issue in this case and finding that given the interpretation Kansas courts have given this language, summary judgment was

inappropriate for either party); 43 Am. Jur. 2d, Insurance § 608, p. 674 (stating that "the phrase 'directly and independently of all other causes' as used in an accident policy requires a showing that the accident was the predominant cause of the injury"); 10 Couch on Insurance § 141:10, p. 141-28 (3d ed. 2005) (stating that "[i]n essence, when an accidental injury aggravated a disease and hastens death so as to cause it to occur at an earlier date than it otherwise would have but for the accident, it is the *direct and independent* cause' of death." [Emphasis added.]).

Therefore, because our Supreme Court has liberally interpreted language contained in accidental death policies, the "directly and independently" language does not always preclude relief when a preexisting condition or the like is present. Accordingly, we must address whether the district court erred in finding that the proximate cause of Marie's injury was the fall and fracture.

*Did the district court err in finding that the proximate cause of Marie's injury was the accident?*

Proximate cause was the ultimate issue throughout the litigation. Proximate cause is a question of fact. *E.g., Hale,* 287 Kan. at 324; see also 10 Couch on Insurance, § 141:19 (noting that whether a preexisting condition precludes recovery is generally a jury question). Therefore, this court reviews the district court's decision to determine whether the trial court's findings are supported by substantial competent evidence. See *McGirr,* slip op. at 12 (finding that where the trial court found McGirr's heart disease was not dormant, the proper inquiry was whether the trial court's findings are supported by substantial competent evidence).

The initial question arose out of documents contained in Stonebridge's claim file asserting conflicting opinions on this issue. As previously stated, the certificate of death listed the manner of death as "natural," the immediate cause of death as cardiac arrest due to (or as a consequence of) myocardial infarction. On the other hand, the proof of death—the attending physician's statement listed the primary cause of death as "fall" and the secondary or contributory cause of death as "cardiac arrest." On November 9, 2009, Clark, for Stonebridge, sent a letter to Dr. Dall, the pronouncing and

certifying physician on the death certificate, asking Dr. Dall additional questions about Marie's death. Specifically, Clark asked Dr. Dall if Marie's injuries from her fall caused her myocardial infarction and cardiac arrest and if any of the injuries Marie suffered as a result of her fall were the proximate cause of her death. Dr. Dall answered "no" to both questions.

Stonebridge's argument centers around Marie's preexisting heart conditions. Clark testified that the only basis for Stonebridge's denial of Marie's claim was her preexisting coronary artery disease. Although Stonebridge pointed out in the district court and on appeal that one of the medical records says Marie "simply tripped, presumably secondary to her Parkinson's," Stonebridge did not rely on this rationale to deny coverage. In contrast, Clark specifically testified during her deposition that Marie had no illness which caused her to fall. Further, Dr. Pazell, the only expert testifying at trial, testified that he saw no indication that Marie's Parkinson's disease played any role in her death.

Turning to Marie's heart conditions, a history of Marie's major heart problems is necessary. Prior to her fall, because of Marie's coronary artery disease, she had two myocardial infarctions in December 2007 and March 2008 and had two stents placed in her heart.

Marie's first cardiac infarction occurred on December 12, 2007. Marie was evaluated in the emergency room at Shawnee Mission Medical Center for chest pain. Dr. Galen Epp diagnosed her with acute myocardial infarction with congestive heart failure. Congestive heart failure is when the heart cannot work hard enough to remove fluids from the body. The doctors put a stent in Marie's coronary artery to hold it open. On December 28, 2007, Marie had a follow-up appointment with Dr. Snodell, her general practitioner, and reported that she was doing well, that she did not have significant chest pain, shortness of breath, dizziness, edema, palpitations, or syncope. Dr. Snodell noted that Marie was doing well from a cardiac standpoint. On March 28, 2008, however, Marie again went to the emergency room because she had another myocardial infarction associated with congestive heart failure.

In July 2008, Marie had a diagnostic cardiac catheterization and cardiac angiography which showed no evidence of restenosis in the left anterior descending artery, meaning that the "vessel was patent and wide open." Her ejection fraction was also normal, which means that the muscle of the heart was functioning to push blood out into the body.

In February 2009, Dr. Snodell noted that Marie had congestive heart disease but she felt well, with minor complaints. Dr. Pazell testified that congestive heart failure is chronic. But, in his opinion from Marie's physical results, she did not have congestive heart failure.

In April 2009, Marie was having chest pain and shortness of breath, so she underwent a treadmill procedure designed to stress the heart. Marie had normal heart function, no arrhythmia, normal blood pressure, and the heart muscle functioned normally with exercise. The test found Marie was a low risk for ischemia. Based on this normal cardiac stress test, Dr. Pazell found that Marie's coronary artery disease was not progressing, it was asymptomatic. He also testified that on the date of her fall, there was no evidence that her coronary artery disease had progressed since April 2009.

But, as Dr. Pazell admitted during cross-examination, the fact that one study does not find anything does not mean that a person does not have coronary artery disease. And, 9 days after the stress test, Marie saw her doctor complaining of chest pain which her doctor attributed to atherosclerosis. "Atherosclerosis" is "characterized by irregularly distributed lipid deposits in the . . . arteries, causing narrowing . . . ." Stedman's Medical Dictionary 162 (27th ed. 2000). Dr. Pazell did, however, reiterate that nothing in the medical records indicated that the medical physicians thought that Marie was in congestive heart failure. .

On August 1, 2009, the day of the fall, when the Kansas City, Kansas, Fire Department ambulance reached Marie, her blood pressure, pulse, respiratory rate, and SpO2 were within normal limits. Dr. Pazell testified that these numbers would not be normal in a person who had active cardiac disease.

In the preoperation consultation notes, Dr. Kevin Ring indicated that at the time of Marie's fall, Marie suffered no loss of conscious-

ness, no chest pain, and no shortness of breath. Dr. Pazell testified that these facts indicated that Dr. Ring thought Marie was a good candidate for surgery. Dr. Williams performed a consultation after surgery and noted that, postoperatively, Maria had increasing hypoxia. Initially, Dr. Williams thought this was due to oversedation; however, Marie received Narcan and remained "quite hypoxemic." Dr. Williams noted that Marie had no illness antecedent to her fall of an acute nature.

Marie's cardiac infarction occurred at approximately 9 p.m. on August 2, the day of her hip surgery. Approximately 3 hours after her surgery, Marie had a SpO2 of 49, which is considered aspiration, and also had a drop in hemoglobin. She also had an increase in troponin, a cardiac enzyme used by emergency room doctors to look for evidence of heart attack, and ST elevation on an EKG, both cardiac complications. Dr. Pazell testified that these conditions would cause the heart to function abnormally because it would not be getting the proper amount of oxygen.

On August 3, 2009, Marie was taken to the cardiac catheterization lab and was being prepped for cardiac catheterization and coronary angiography when she coded. Marie died at 12:20 p.m.

At trial, Clark's deposition and Stonebridge's claim file—which Clark relied on to evaluate Foster's claim for benefits—were admitted into evidence. Clark testified in her deposition that she reviewed all the medical records in the claim file and concluded that Marie's death was not caused by an accidental bodily injury. Clark concluded that Marie's death was due to coronary artery disease based on the certificate of death stating that Marie had a myocardial infarction and the follow-up questionnaire, both completed by Dr. Dall.

Foster's attorney cross-examined Clark on the factual distinction that the death certificate listed the cause of death as myocardial infarction not coronary artery disease. He further cross-examined Clark regarding the medical records in the claim file indicating Marie did not have any acute illness before her fall, that less than 4 months before her fall, Marie's heart was a low risk for ischemia, that Marie's lungs were clear prior to surgery, that Marie's heart rhythm was regular, and that she had no shortness of breath or

chest pain and was cleared for surgery. Clark testified that before denying coverage, she did not know and she did not consult with anyone about what role the surgical complications of hypoxia, CT finding indicating atelectasis or infiltrates, or possible aspiration may have played in Marie's death. Foster's attorney further cross-examined Clark about the anesthesia note from 8 p.m. that says "no complaints or complications" but at 11:05 p.m. says "ORIF left hip with hypoxia" and "low bar or infiltrates on CT." Further, at trial, Dr. Pazell testified that the medical records were not consistent with Dr. Dall's finding that there were no complications after Marie's hip surgery.

Dr. Pazell also testified that Marie's preexisting heart condition played no role in her death. According to Dr. Pazell, Marie's condition was not symptomatic and she "could have been expected to live a normal life span, but she fell and broke her hip. Then she had complications from the anesthetic and from surgery and this put a strain on her heart and that caused the problem that killed her."

Dr. Pazell testified at trial that there was no question that Marie had coronary artery disease at the time of her fall. Dr. Pazell, however, testified that Marie was not suffering from congestive heart failure at the time of her fall. Dr. Pazell testified that Marie had postoperative complications of aspiration and low hemoglobin. He testified that these complications could lead to cardiac arrest, regardless of whether the patient had a preexisting heart condition.

Dr. Pazell was cross-examined with a letter to Foster's attorney from one of Marie's doctors. In the letter, Dr. Jhulan Mukarji, the primary cardiologist during the events leading to Marie's death, stated that based on the current literature, it was difficult to support a direct association between Marie's injury and the resulting fracture and the myocardial infarction that resulted in her death. The letter went on to say: "There is data which suggests that patients who have coronary artery disease are at risk of acute coronary events including myocardial infarction following surgery. There is very little data which suggests a similar robust association between hip fractures and an acute cardiac event." Dr. Pazell testified that he did not agree with these conclusions. Interestingly, however, it

seems that this defense exhibit supports recovery under *Boring*, but Dr. Pazell continued to assert that the cardiac event was a direct result of the hip fracture, not that the fall activated a dormant condition.

It is clear that there was conflicting testimony regarding whether and to what extent Marie's preexisting heart conditions contributed to her death. Because it is unclear which rationale the district court relied on to reach its decision, *Boring* or the rationale that Marie's death would have occurred independent of her preexisting conditions, both factual scenarios for reaching the district court's ultimate proximate cause finding must be evaluated to determine if each is supported by substantial competent evidence.

Beginning with the *Boring* rationale, the factual scenario faced by that court is similar to the factual scenario here. Boring had a medical history of gastrointestinal and cardiac problems, including a myocardial infarction, attacks of cholecystitis, and episodes of tightness in his chest with exercise in the 5 months preceding the accident that resulted in his death. Two weeks before his car accident, however, he was having no gastrointestinal or cardiac symptoms and was doing well. On the day of the accident, Boring was driving when he was struck in the rear by another vehicle. He got out of his vehicle, saw that no one was badly hurt, and suddenly collapsed to the ground. He was taken to the hospital where he was pronounced dead on arrival. The death certificate listed Boring's immediate cause of death as myocardial infarction due to coronary arteriosclerosis. Our Supreme Court found that these conditions did not preclude recovery under the policy, but rather presented a question of fact on the issue of causation and reversed summary judgment in favor of the insurance company. 209 Kan. at 422.

Similarly, as outlined above, Marie had a history of cardiac problems, but in her cardiac tests prior to her accident, she was not experiencing problems. The death certificate listed Marie's immediate cause of death as cardiac arrest due to myocardial infarction. If the district court judge's decision did in fact rely on *Boring's* dormant disease rationale to support its judgment, the decision is supported because there is substantial competent evidence in the

record to support a finding that Marie's dormant heart conditions were activated by her accidental fall and caused her death. Dr. Pazell testified that in his opinion Marie did not have congestive heart failure. He also testified that her coronary artery disease was not progressing, rather it was asymptomatic, and on the date of her fall, there was no evidence that her coronary artery disease had progressed since April 2009.

Stonebridge argues that this case is similar to *McGirr*, slip op. at 13-15, where a panel of this court found that the district court's decision upholding the insurer's denial of the accidental death claim, after discussing *Boring*, was supported by substantial competent evidence. As the *McGirr* court noted, however, the proper inquiry for an appellate court is to determine whether the district court's findings are supported by substantial competent evidence. Slip op. at 12. It is true that there is conflicting evidence on the dormancy of Marie's preexisting conditions in the record; however, because an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact, the district court's decision should not be reversed. See *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010); *McGirr*, slip op. at 13-15.

Further, *McGirr* is factually distinguishable. There, the insured experienced constant chest pain, frequent shortness of breath, and felt like his heart was skipping a beat for 2½ years leading up to his fall. Here, Dr. Pazell testified that Marie's coronary artery disease was asymptomatic on the date of her fall and there was no evidence that her coronary artery disease had progressed since April 2009.

If the district court relied on the rationale that Marie's death would have occurred even without the preexisting condition, the evidence supporting this finding is narrower. However, Dr. Pazell explicitly testified to this fact at trial; he testified that Marie's hip surgery complications could lead to cardiac arrest regardless of whether the patient had a preexisting heart condition. Further, Stonebridge's claims manager Allen testified that at the time she denied coverage in this case, she was unaware of any evidence that Marie's preexisting coronary artery disease caused her to fall and

the only evidence in the medical records that indicated the disease caused her to have a myocardial infarction was the death certificate.

Therefore, under either potential factual rationale the district court could have used to reach its ultimate proximate cause finding, the final judgment ruling can be upheld because substantial competent evidence supports the judge's finding that Marie's fall was the proximate cause of her death.

### Dr. Pazell's expert testimony

Stonebridge argues that Dr. Pazell's trial testimony went beyond the scope of his expert disclosure pursuant to K.S.A. 2010 Supp. 60-226(b)(6) and his deposition testimony. Although the arguments are not clearly articulated, Stonebridge appears to first argue that the district court abused its discretion in allowing Dr. Pazell to testify regarding whether Marie's preexisting conditions *were* dormant. Then, Stonebridge argues that the district court erred by denying its motion for mistrial due to the new and unexpected testimony of Dr. Pazell; Stonebridge argues Dr. Pazell testified for the first time at trial that the status of Marie's preexisting conditions was irrelevant because the conditions did not play a role in her death. The factual circumstances relating to each challenge are intertwined, so the issues will be addressed together after stating the appropriate standard of review for each challenge.

### Standard of review

Stonebridge first argues that the district court abused its discretion in allowing Dr. Pazell to testify regarding whether Marie's prexisting conditons were dormant. "A trial court has broad discretion regarding the admissibility of expert testimony." *Frans v. Gausman,* 27 Kan. App. 2d 518, 527, 6 P.3d 432, *rev. denied* 270 Kan. 897 (2000). This court must decide if the court abused its discretion.

Stonebridge then argues that the district court abused its discretion by failing to grant a mistrial. Unlike in criminal cases where a Kansas statute provides grounds for a mistrial, in a civil case, this court reviews a decision to deny a mistrial for abuse of discretion. *Klinzmann v. Beale,* 9 Kan. App. 2d 20, 27, 670 P.2d 67 (1983); 7

Kansas Law and Practice, Kansas Trial Handbook § 33:1 (2d ed. 2006).

*Applicable law on expert testimony*

As Stonebridge points out, K.S.A. 2010 Supp. 60-226(b)(6) requires disclosure of expert testimony before trial:

"(6) *Disclosure of expert testimony.* (A) *In general.* A party must disclose to other parties the identity of any witness it may use at trial to present expert testimony.

(B) *Required disclosures.* Unless otherwise stipulated or ordered by the court, if the witness is retained or specially employed to provide expert testimony in the case, or is one whose duties as the party's employee regularly involve giving expert testimony, the disclosure must state:

(i) The subject matter on which the expert is expected to testify;

(ii) the substance of the facts and opinions to which the expert is expected to testify; and

(iii) a summary of the grounds for each opinion."

*Did the district court abuse its discretion in allowing Dr. Pazell to testify regarding whether Marie's prexisting conditons were dormant?*

The expert disclosure admitted at Dr. Pazell's deposition stated:

"In addition to presenting a general discussion about the various ancillary aspects of medicine relevant to this case, at the present time it is anticipated that Dr. Pazell will offer the following opinions in this matter:

A. Marie Foster's accident fall and injury on August 1, 2009, caused or aggravated, activated, revived, or precipitated her pre-existing heart disease, ailment or condition, and resulted in her death on August 3, 2009.

B. If Marie Foster had not tripped, fallen, and broken her hip, she would not have died."

In ruling on the renewed motion for summary judgment, the district court found asymptomatic was synonymous with dormancy. "Asymptomatic" is defined as "neither causing nor displaying symptoms." Webster's II New College Dictionary 70 (2001). In his written review of Marie's medical records and during his deposition, Dr. Pazell did not use the word "dormancy," but his opinion was consistent with disclosure "A" above. In his written review of Marie's medical records, Dr. Pazell says: "Dr. Mukhari [a cardiologist] did not feel that the fall, fracture, and heart attack resulted

in her death. He does, however, note there is data which states that patients who have coronary artery disease are at risk of acute coronary events following surgery." In his written summary and conclusions, Dr. Pazell noted Marie's medical history and discussed causation:

"Ms. Marie Foster at the end of July 2009 had coronary artery disease. She had stints [*sic*]. She had a wildly patent coronary artery and was doing fine. She tripped and fell. She fractured her hip. She sustained an intertrochanteric fracture. She had surgery. After she had surgery, she had a heart attack and died.

"If she had not fallen and broken her hip, she would not have had surgery. If she did not have surgery, she would not have had the heart attack. I believe the cardiologist's letter supports that conclusion.

. . . .

"The fact remains if Ms. Foster had not tripped, fallen, and broken her hip she would not have died. The fact remains obvious to anyone. She did not have a cardiac event which caused her to trip and fall. Her death was due to a fractured hip which by necessity had to be fixed. An individual can bleed to death from an intertochanteric hip fracture. The standard of care at this time is to internally fix those fracture as efficaciously as possible, and this was done. *The postoperative cardiac event occurred due to the necessity for surgery and anesthetic."* (Emphasis added.)

When asked in his deposition to discuss what role the condition of her heart played in causing her death, Dr. Pazell testified:

"A. Clearly, she had had previous abnormalities in her heart. *That certainly didn't help the issue. But she was asymptomatic,* and she was in good enough shape for Dr. Ring to say, 'Her lungs are clear, head, eyes, nose, and throat were normal.' "

The following questions were also asked:

"Q. Would she have died but for her preexisting heart condition?
"A. I think that's impossible for me to answer but it's—it would be speculation." (Emphasis added.)

He was also asked about the correlation between elderly people having hip problems and the mortality rate:

"Q. All right. And so as a practical matter, hip fractures, because they are suffered most commonly among the geriatric population, occur in patients that have multiple other medical problems usually. Correct?
"A. Correct.

"Q. All right. And that probably has something to do with the high . . . mortality rate. Correct?

"A. Correct."

From Dr. Pazell's written opinion and deposition testimony, although he did not use the word "dormant," it seemed that the plaintiff was offering Dr. Pazell's testimony for the purpose of proving its case under *Boring* by showing that Marie's dormant condition was activated by the fall and resulted in Marie's death. This is in line with expert witness anticipated opinion "A" that Dr. Pazell would offer an opinion that Marie's "accident fall and injury . . . caused or aggravated . . . her pre-existing heart disease . . . and resulted in her death." The district court, therefore, did not abuse its discretion in overruling Stonebridge's objections regarding Dr. Pazell's testimony on dormancy when it allowed Dr. Pazell to testify at trial that Marie's coronary artery disease was "asymptomatic" and "stable."

*Did the district court abuse its discretion by failing to grant a mistrial?*

Stonebridge also argues that the district court erred by denying its motion for mistrial due to the new and unexpected testimony of Dr. Pazell offered for the first time on the day of trial.

But Stonebridge did not contemporaneously object to this testimony at trial as required by K.S.A. 60-404; therefore, Stonebridge failed to preserve this issue for appeal. See *State v. King*, 288 Kan. 333, 341-49, 204 P.3d 585 (2009). K.S.A. 60-404 provides that a judgment shall not be reversed on account of the "erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." The court in *King* acknowledged that "our past decisions may have relaxed the objection requirement in the evidentiary context, . . . [but] [f]rom today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims . . . must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." 288 Kan. at 349; see also *Hamrick v. Huebner*, No. 106,215, 2012 WL 2785930, at *6-7 (Kan. App. 2012) (unpublished opinion) (finding that the issue of

the extent of expert witness disclosure was not preserved for appeal because party failed to make a contemporaneous objection at trial as required by K.S.A. 60-404).

*Motion under K.S.A. 60-252(c)*

Stonebridge argues in its appellant's brief that the district court erred by denying its motion for judgment on partial findings pursuant to K.S.A. 60-252(c) at the close of Foster's evidence. Foster argues that Stonebridge never made a motion pursuant to K.S.A. 60-252(c). Stonebridge concedes that it did not raise this issue in its reply brief. Issues not raised before the trial court cannot be raised on appeal; therefore, this issue is not properly before the court and need not be addressed. See *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009).

*Attorney fees*

Stonebridge argues the district court erred in denying its motion for partial summary judgment and its renewed motion for summary judgment on attorney fees. Stonebridge also argues that the district court erred in entering a judgment for attorney fees against Stonebridge under K.S.A. 40-256 because Stonebridge's claim denial was without "just cause or excuse." When the district court has authority to award attorney fees, "[w]e review the district court's decision regarding attorney fees under an abuse of discretion standard. [Citation omitted.] The issue is to be determined by the district court based on the facts and circumstances of each case. [Citation omitted.]" *Tyler v. Employers Mut. Cas. Co.*, 274 Kan. 227, 242, 49 P.3d 511 (2002).

K.S.A. 40-256 provides:

"That in all actions hereafter commenced, in which judgment is rendered against any insurance company as defined in K.S.A. 40-201 . . . , if it appear[s] from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action, including proceeding upon appeal, to be recovered and collected as a part of the costs."

"Whether an insurance company's refusal to pay is without just cause or excuse is determined on the facts and circumstances in each case." *Johnson v. Westhoff Sand Co.* 31 Kan. App. 2d 259, 274, 62 P.3d 685, *rev. denied* 275 Kan. 964 (2003). Our Supreme Court has found that if there is a bona fide and reasonable factual ground for contesting an insured's claim, there is no failure to pay without just cause or excuse. *Koch, Administratrix v. Prudential Ins. Co.*, 205 Kan. 561, 565-66, 470 P.2d 756 (1970); see *Johnson*, 31 Kan. App. 2d at 274.

Kansas courts have also recognized, however, that an insurer has a duty to make a good-faith investigation of the facts surrounding the claim. See *Watson v. Jones*, 227 Kan. 862, 871, 610 P.2d 619 (1980); *Brown v. Combined Ins. Co. of America*, 226 Kan. 223, 227, 597 P.2d 1080 (1979); *Johnson*, 31 Kan. App. 2d at 274. "[T]he circumstances are to be judged as they would appear to a reasonably prudent man having a duty to investigate in good faith and to determine the true facts of the controversy." *Watson*, 227 Kan. at 871; see *Evans v. Provident Life & Accident Ins. Co.*, 249 Kan. 248, 261-62, 815 P.2d 550 (1991).

In reviewing this question, this court looks at the circumstances confronting the insurer when the payment of loss is denied. *Watson*, 227 Kan. at 871; *DiBassie v. American Standard Ins. Co. of Wisconsin*, 8 Kan. App. 2d 515, 523, 661 P.2d 812 (1983). Because Stonebridge makes no attempt to separate the facts available to the trial court at summary judgment from the facts known at trial, we will only address the district court's final decision to award attorney fees, not its earlier denial of fees at summary judgment.

After the trial, the court gave its opinion on the record:

"As to the request for attorney's fees. Pursuant to 40-256, the court is going to grant the same, finding that the insurance company's refusal to pay was without just cause or excuse.

"The reasoning behind the court's decision is that the court finds that based on the limited investigation done by the insurance company, the court finds that the insurance company relied on basically two pieces of paper: One being the death certificate, the other being the clarification by Dr. Dall. The failure of the insurance company to further investigate or give any reasonable consideration to the Shawnee Mission medical records, nor understanding them, and the failure to give any reasonable consideration of the information provided by Dr. Snodell,

from the testimony the court surmises that the only possible meaning the insurance company could have for its policy is that an insured must die immediately and as a direct result of the fall.

"One of the concerns of the court was the insurer's lack of a good faith evaluation when it relies on its employees who are limited to on-the-job training, who have no training in medical or legal terminology at a minimum, who have no printed policy, and rely solely on the common language without any []ability to assess medical terminology against legal standards, which is basically the basis of their jobs."

Stonebridge argues that the district court erred in awarding Foster attorney fees because Stonebridge's denial was not without just cause or excuse. Stonebridge argues that at the time it denied the claim, it was faced with two conflicting opinions: one opinion based on the death certificate and follow-up questions asked of Dr. Dall, stating that Marie's fall did not cause her myocardial infarction and cardiac arrest; and the other opinion based on the proof of death—the attending physician's statement from Dr. Snodell, stating that the cause of death was the fall and secondary cause of death was cardiac arrest. Stonebridge also argues that Dr. Snodell subsequently admitted that he had no basis for the opinions he set forth in the attending physician's statement.

Foster, on the other hand, argues that district court properly awarded attorney fees because the denial of her claim was without just cause or excuse. Foster first points out that Stonebridge attempts to attack the trial court's final judgment by utilizing information gathered after it denied Foster's claim, specifically an affidavit from Dr. Snodell. Dr. Snodell's affidavit is dated August 19, 2010, nearly 8 months after Stonebridge's decision to deny coverage on December 24, 2009. Because the circumstances confronting the insurer when payment of loss is denied determines the question of attorney fees, what Stonebridge knew on December 24, 2009, determines the fee question; therefore, Dr. Snodell's affidavit was irrelevant. See *Watson*, 227 Kan. at 871.

Foster also argues that Stonebridge breached its duty to investigate in good faith. As pointed out by Foster, under Kansas law, an insurance company is not required to pay a claim when there is a good-faith legal or factual reason to deny a claim, but at the same time, the insurer has a duty to make a good-faith investigation

of the facts before refusing to pay. See *Connor v. Occidental Fire & Cas. Co.*, 281 Kan. 875, 889-91, 135 P.3d 1230 (2006); *Matthews v. Travelers Insurance Co.*, 212 Kan. 292, 298-300, 510 P.2d 1315 (1973); *Brown v. Continental Casualty Co.*, 209 Kan. 632, 640-41, 498 P.2d 26 (1972); *Knuth v. State Farm Mut. Auto. Ins. Co.*, 30 Kan. App. 2d 184, Syl. ¶ 2, 41 P.3d 287 (2000). " 'Good faith on the part of the insurer implies honesty, fair dealing and adequate information.' [Citation omitted.]" *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 619, 567 P.2d 1359 (1977).

Couch on Insurance provides: "Implicit in the duty to investigate is the requirement that the investigation be adequate and fair. Adequacy and fairness means that the insurer has a duty to diligently search for evidence which supports insured's claim and not merely seek evidence upholding its own interests." 14 Couch on Insurance § 207:25, p. 207-41 (3d ed. 2005). Couch lists an example of failure to investigate:

"[A]n insurer [who] was [found] guilty of bad faith where its insured died as result of an accident which caused head injuries and, ultimately heart failure, and the insurer conducted only a perfunctory investigation, denying the claim on the basis that death was due to a heart attack, rather than the accident, without adequately investigating whether the accident had caused the heart attack." 14 Couch on Insurance § 207:25, pp. 207-41 to 207-42 n.59 (citing *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 50 Cal. Rptr. 2d 224 [1996]).

It is clear from the district court's bench ruling that it considered Stonebridge's lack of investigation and failure to evaluate the claim in good faith when awarding attorney fees to Foster. The court discussed its concerns with Stonebridge's employees "who are limited to on-the-job training, who have no training in medical or legal terminology at a minimum, who have no printed policy, and rely solely on the common language without any []ability to assess medical terminology against legal standards, which is basically the basis of their jobs."

The court's findings of fact are supported by the record testimony of Stonebridge's employees. Both Clark and Allen testified that they had no training at Stonebridge other than on-the-job training. Neither Clark nor Allen were provided with any written guidelines to assist in investigating the claim, and neither consulted

Stonebridge's staff doctor before denying the claim. See *Mariscal*, 42 Cal. App. 4th at 1624-25 (noting that failure to understand medical terms and failure to consult with staff doctor were factors that supported bad-faith finding). Further, Allen testified that she did not investigate the claim at all before denial. The following portion of Allen's trial testimony is illustrative of the judge's concerns:

"Q. [Plaintiff's counsel:] It's your understanding that Marie Foster fell?
"A. [Allen:] Correct.
"Q. And you agree that she fractured her hip when she fell?
"A. Correct.
"Q. And you agree that this was an accidental fall?
"A. Correct.
"Q. In this case, Marie Foster suffered a myocardial infarction and cardiac arrest as a result of having hip surgery, true?
"A. That's what it appears, yes.
"Q. And when you reviewed this file, do you recall that there was information about an infiltrate and atelectasis on CT? Do you recall that?
"A. Yes.
"Q. But you didn't know when you reviewed the file what that meant, true?
"A. That's correct.
"Q. And you don't—did not know whether that represented a post-operative complication, true?
"A. True.
. . . .
"Q. Are you aware of any evidence in the medical record that indicates that Marie Foster's preexisting coronary artery disease caused her to have a myocardial infarction during her hospitalization?
"A. Not during her hospitalization. Just what was on the death certificate."

Allen admitted she did not have any idea what the medical records said that supported her decision to deny the claim; she specifically said she did not know what the terms hypoxia, infiltrate, cardiac enzyme, or "St elevation on a EKG" meant and did not investigate Dr. Dall's letter stating that the patient had "increased cardiac enzymes," and "EKG showed ST elevation." Allen also recounted her deposition testimony where she answered the question "[w]hat in the medical record indicates that Marie Foster's cardiac arrest was not a result of her bodily injury?" by saying, "I don't know." She also said that when she denied coverage, the medical records gave no indication that Marie would have died on

August 3 if she had not fallen. She admitted that at the time she denied coverage, she had two conflicting reports, one from Dr. Snodell and one from Dr. Dall.

The district court found that Stonebridge did not fulfill its obligation to conduct a good-faith evaluation of the claim. From the record, the district court did not abuse its discretion in making this finding. On appeal, Stonebridge does not contest the amount of the attorney fee award as unreasonable. Therefore, it concedes the hourly rates of and time spent by counsel for Foster's litigation were appropriate. See *Drew v. Cobblestone Builders, Inc.*, No. 105,673, 2012 WL 3289948, at *7 (Kan. App. 2012) (unpublished opinion).

*Attorney fees and costs on appeal*

Foster timely filed a motion in May 2012 (and a renewed motion in October 2012 following oral arguments) for her attorney fees and costs associated with this appeal as provided in Supreme Court Rule 7.07 (2011 Kan. Ct. R. Annot. 64). The rule permits an appellate court to "award attorney fees for services on appeal in any case in which the trial court had authority to award attorney fees." Rule 7.07(b) (2011 Kan. Ct. R. Annot. 64). By virtue of K.S.A. 40-256, the district court had such authority, and this court may, in turn, entertain such a fee request. Foster's May motion requested $40,952.50 in attorney fees and $504.79 in costs and the October motion requested revised attorney fees of $46,857.50 for this appeal.

A panel of this court recently outlined an appellate court's role in determining attorney fees on appeal:

"We, then, measure the attorney-fee request by the same substantive standards set out earlier in our review of the district court's award. That is, did [the insurer's] decision to appeal amount to a refusal to pay a claim covered under the policy 'without just cause or excuse?' Our determination of the issue is not preordained by our decision on the district court's award of attorney fees. We reviewed that award for abuse of discretion and found none. That standard is an especially forgiving one and would require that we affirm even if we might not have ruled the same way had we been sitting on the bench in the district court. We are not similarly constrained with a fee request presented to us in the first instance." *Drew*, 2012 WL 3289948, at *8.

Stonebridge takes substantially the same position that it did in appealing the district court's attorney fee award: Foster cannot establish under the facts of this case that Stonebridge's denial was without just cause or excuse because a "good-faith legal controversy exists as to liability." Stonebridge does not dispute the reasonableness of the amount of attorney fees requested, but it does take issue with Foster's request for costs.

Even under the independent standard of review allowed for appellate attorney fees, however, Stonebridge did not meet its duty of good faith to investigate, but rather it sought evidence from Dr. Dall upholding its own interests. See 14 Couch on Insurance § 207:25. Clark only contacted Dr. Dall before issuing a denial; she did not attempt to contact Dr. Snodell who offered an opinion supporting coverage under the policy or any other doctors who evaluated Marie. Further, as stated above, both Clark and Allen testified that they had no training at Stonebridge other than on-the-job training. Neither Clark nor Allen were provided with any written guidelines to assist in investigating the claim, and neither consulted Stonebridge's staff doctor before denying the claim. Further, Allen testified that she did not investigate the claim at all before denial. Stonebridge failed in its duty to conduct a good-faith investigation of the facts before finally refusing to pay. See *Brown*, 209 Kan. at 641.

Turning to the amount of attorney fees that should be awarded, Stonebridge does not dispute the reasonableness of the hourly rates or the times devoted to the tasks as detailed in the attachments to either of Foster's motions; therefore, this court is not required to independently review those aspects of the fee requests. See *Drew*, 2012 WL 3289948, at *8. This court has noted that it "ha[s] some independent obligation to determine that the requested attorney fees are 'for services on appeal' and, therefore, come within the scope of Rule 7.07(b)." *Drew*, 2012 WL 3289948, at *9. In this case, however, unlike in *Drew*, the requested fees all include tasks connected with this appeal; therefore, the court need not make adjustments to the number of hours billed.

Stonebridge does, however, take issue with Foster's claimed costs, arguing they are not supported by statute. Stonebridge ar-

gues that none of the costs claimed by Foster in her May 2012 motion are authorized by statute. Foster asks for a total of $504.79 in costs in exhibit 2 of the motion and affidavit. K.S.A. 2011 Supp. 60-2003 provides the items that can be claimed as "costs":

"Items which may be included in the taxation of costs are:
(1) The docket fee as provided for by K.S.A. 60-2001, and amendments thereto.
(2) The mileage, fees, and other allowable expenses of the sheriff, other officer or private process server incurred in the service of process or in effecting any of the provisional remedies authorized by this chapter.
(3) Publisher's charges in effecting any publication of notices authorized by law.
(4) Statutory fees and mileage of witnesses attending court or the taking of depositions used as evidence.
(5) Reporter's or stenographic charges for the taking of depositions used as evidence.
(6) The postage fees incurred pursuant to K.S.A. 60-303, and amendments thereto.
(7) Alternative dispute resolution fees shall include fees, expenses and other costs arising from mediation, conciliation, arbitration, settlement conferences or other alternative dispute resolution means, whether or not such means were successful in resolving the matter or matters in dispute, which the court shall have ordered or to which the parties have agreed.
(8) Such other charges as are by statute authorized to be taxed as costs."

The costs Foster seeks in this appeal are as follows: (1) "AAP>Mileage: Deliver Order to Defense," (2) "Sharon Cahill> Trial Transcript," (3) "AAP>Mileage: WyCo Courthouse," (4) "Photocopies," (5) "Postage>Brief to Def Counsel," and (6) "Fed Ex. File Brief w/Appellate Court." As Stonebridge points out, none of these items are allowed as "costs" under K.S.A. 2011 Supp. 60-2003. See *Divine v. Groshong*, 235 Kan. 127, 141, 679 P.2d 700 (1984) ("The term 'costs' ordinarily means the fees and charges of the court—filing fees, fees for service of process and the like."). Therefore, Stonebridge is correct that Foster is not allowed to recover these costs on appeal.

In conclusion, we are granting Foster's revised request for appellate attorney fees in the amount of $46,857.50 and denying Foster's request for costs of $504.79.

Affirmed; appellate attorney fees granted and costs denied.