NOT DESIGNATED FOR PUBLICATION

No. 122,924

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

BRENDEN DEAN EVANS,
*Appellee*,

and

CHRISTINE EVANS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed March 26, 2021. Affirmed.

*Cody R. Smith*, of Hutchinson, for appellant.

*Shannon S. Crane*, of Hutchinson, for appellee.

Before HILL, P.J., GARDNER, J., and BURGESS, S.J.

PER CURIAM: Brenden Dean Evans (Father) and Christine Evans (Mother) married in 2014 but divorced in 2019. Following a trial, the district court awarded residential custody of the couple's minor daughter, N.E., to Father. Mother appeals, arguing the district court abused its discretion by doing so. Mother argues the district court's ruling was based on an error of law because it failed to properly consider evidence of Father's domestic abuse and the relationship N.E. had with her half-sister. Mother also argues the district court's decision was unreasonable because, as it found, Father had anger issues. But finding no abuse of discretion, we affirm. We also deny Father's motion for attorney fees.

1

*Factual and Procedural Background*

Mother and Father married in 2014, but Father filed for divorce in June 2019. They had one minor daughter, N.E., born in 2015. In his petition for divorce, Father asked the district court to award him custody of N.E.

The district court's temporary order awarded Father primary residential custody of N.E. and gave Mother parenting time on certain days and times. In July, Mother moved to modify that temporary order and sought primary residential custody of N.E. She argued, among other things, that separating N.E. from her half-sister, who lived with Mother, was not in N.E.'s best interests. But the order remained in effect until the trial in January 2020.

*Father's testimony*

At trial, Father testified about the many moves the family had made, usually at Mother's behest. They first lived in Hutchinson, Kansas before moving in with Mother's parents in Elizabethtown, Kentucky. They lived there for three months before moving to Buffalo, Kentucky, where they lived for about 11 months. From there, they moved back to Hutchinson and lived with Father's parents for a couple of months. After that, they moved to a different house in Hutchinson before moving to Wichita, Kansas. They later moved from Wichita back to Hutchinson, where they lived together until they divorced. Because their moves were often during the school year, N.E. had completed a full school year in one place only when they lived in Wichita.

Father had always wished to stay in Kansas because that is where he was born and raised and has extended family. N.E. sees her cousins and grandparents regularly, and they enjoy spending time with her. Grandfather was a Boy Scout leader who was excited about the possibility that N.E. might join a scouting program. At the time of the divorce,

Mother's two brothers lived in Kentucky and her parents lived in Michigan, where Father believed the rest of Mother's extended family also lived.

Before Father filed for divorce, Mother began taking trips to Texas to interview for jobs. While she was gone, Father took care of N.E. and Mother's child from another father. During the divorce proceedings, Mother moved to Texas and lived there at the time of trial. Since moving to Texas, Mother's parenting time often varied. Because of the distance between Kansas and Texas, she often forfeited her scheduled time during the week and sometimes on scheduled weekends as well. When Father and Mother did exchange N.E., the two met in Ardmore, Oklahoma, around four-and-a-half hours from each of their houses. Mother later testified that the father of her other child, who lived in Wichita, planned to move to Texas after he finished his degree.

After he filed for divorce, Father continued to live in Hutchinson and work at Decker Mattison. He worked 8 a.m. to 5 p.m. Monday through Friday and was sometimes on call at other times. He was also in the Army Reserve and had been for 12 years. Father made arrangements for N.E.'s care when he had to be on call or train for the Army Reserve. Father felt that it was important for N.E. to have a home base, which was why he asked the district court to continue to give him primary residential custody of N.E.

Father acknowledged a prior Department for Children and Families (DCF) report accusing him of neglect and abuse. But DCF later found that report to be unsubstantiated. The accusation stemmed from bug bites on N.E.'s legs. He had a garden in his backyard that had an unusual number of mosquitos that year, but he had since sprayed and taken care of the problem. On cross-examination, Father said that N.E. also had a bite on her hand and he had taken her to the doctor, who prescribed antibiotics for it. Father believed it was a spider bite, but the doctor was unable to confirm that.

Father also acknowledged an allegation about steroid use. He admitted that he had bought steroids in the past, doing so most recently a little over a year before trial. He alleged that Mother had also previously used steroids but he did not know whether she was using at the time of trial—he presumed she was not. Father got drug tested at least once a month through the Army Reserve and always had clean tests. But he acknowledged that the Army Reserve does not test for steroids. To Father's knowledge, he had never been tested for steroids.

On rebuttal, Father said that he knew that N.E. would move in with Mother if he got deployed, but if his enlistment in the Army Reserve caused an issue, he would end the enlistment. He had spoken with his commander, who told Father he would allow him to get out of the Army Reserve if need be. He disputed Mother's concerns about his family members helping him take care of N.E. During the six months right before trial, N.E. had spent only two nights with other family members. Father admitted that he had lost his temper and sometimes became overly angry, but he did not specify what acts he had taken when angry.

*Mother's testimony*

Mother testified that she worked for Securitas Security, a job she started when she moved to Texas. Before accepting that job, she had applied to many jobs in Kentucky, California, Minnesota, and Texas. When she lived in Kansas, she worked at the Hutchinson Clinic. She moved to Texas because she wanted a job with better pay and benefits, and she also wanted to get her and her children away from the situation in Hutchinson. Her Texas job did not require her to work nights, weekends, or holidays, and her schedule was flexible if she needed to care for the children.

Mother was concerned about Father's schedule with the Army Reserve. Father's training schedule fluctuates, as does the amount of time he is gone for annual training.

Father had been gone for two weeks during August, which was during the school year, and Mother did not like that someone else had to pick up N.E. during that time. She also expressed concern about the possibility that the Army Reserves could deploy Father without much notice. Mother's schedule was more flexible and did not present such concerns.

Mother's other child was eight years old at the time of trial. N.E. and her other child had been around each other since N.E. was born. Both children had expressed their desire to spend more time together since Mother and Father got divorced, which was one of the reasons why Mother asked the district court for primary residential custody of N.E.

Before Father filed for divorce, they had discussed custody of the children. Father told her he was not going to fight her over custody of N.E., and that he would most likely move to Texas also. Father told Mother that he had spoken with Decker Mattison and his unit in the Army Reserve about moving to Texas. These statements by Father were part of the reason she accepted the job in Texas.

Mother was also concerned about the cleanliness of Father's house. The DCF employee's visit to Father's house stemmed in part from how dirty Father's home was. When N.E. visited her one weekend, she noticed something wrong with N.E.'s eye, so she took her to an eye doctor. The doctor told Mother to make sure that everything was clean, and that N.E. took eye drops. During that same visit Mother noticed a bite on N.E.'s hand, yet Father had not given her any medication for the bite or told her N.E. had seen a doctor about it. The eye problem and bite led Mother to believe that Father was not adequately caring for N.E.

Mother was concerned about Father's anger issues, which existed from the beginning of their relationship. About six months into their relationship, Father moved in with Mother. Shortly after that, he was drinking and went out on the porch and started

punching a wooden pillar. Father had also dented their vehicle by punching it. Father punched their dog after it knocked over their trash can. And they had replaced the bathroom door several times because Father had punched a hole through it, once in front of Mother's other child.

Father directed his anger to Mother as well. After they argued, Father "put his hands around [her] and squeeze[d] as hard as he could until [she] would stop moving and this happened so many times. . . . And then sometimes he [would] walk backwards and lay on top of [her] until [she] stopp[ed] talking or [got] his way." She believed that Father's steroid use exacerbated his anger problem. Mother denied using steroids. The two tried marriage counseling but it did not succeed.

Mother never considered moving back to Hutchinson after the district court awarded Father temporary custody of N.E. because she had no way to provide for her children in Hutchinson. She did not consider her previous job at the Hutchinson Clinic a good job because of how stressful the work environment was.

When asked whether the family's moves contributed to instability, Mother disputed Father's testimony that the moves were always her idea and said that they were joint decisions. She believed the moves were justified and did not contribute to instability because N.E. was not in school when they moved, and her other child always completed the school year wherever they lived.

Mother left N.E. with Father when she was out of town, despite her concerns about his parenting ability. Her concerns revolved around the fact that Father always relied on other people to help take care of N.E. Although Mother was fine with certain members of Father's family helping to take care of N.E., she was concerned about Father's brother. Had Father been the only person in Hutchinson when Mother was out of town, Mother would have been much more concerned about N.E.

6

*The district court's decision*

After hearing arguments from both parties, the district court found that Father should retain primary residential custody of N.E. It stated that jobs were harder to find in Kansas, but the district court did not understand Mother's reasoning behind moving to Texas when the fathers of both her children still lived in Kansas. The district court understood that Mother moved for a better work opportunity in Texas, but it was not persuaded that Mother had tried hard enough to find work in Wichita or Kansas City. As for Father's anger issues, the district court said it was not okay that Father damaged property when he got mad, especially in front of a child. The district court hoped that Father would get help concerning his anger issues, but it did not order anger management. Father had stability and an extensive support system in Kansas. Ultimately, the district court found that the balancing of interests supported N.E.'s staying with Father in Kansas.

Mother timely appeals.

*Did the District Court Err by Failing to Consider Evidence of Father's Domestic Abuse?*

Mother first argues the district court erred as a matter of law by failing to consider evidence of Father's domestic violence.

But our review of the issues on appeal is limited. "Given the district court's unique vantage point of what is often an emotionally charged situation in child custody disputes, an appellate court generally will not overturn such decisions unless the court abused its discretion." *In re Marriage of Bahlmann*, 56 Kan. App. 2d 901, 903, 440 P.3d 597 (2019). A district court abuses its discretion if its ruling is based on an error of law; an error of fact; or is arbitrary, fanciful, or unreasonable, i.e., no reasonable person would take the view adopted by the district court. *In re Marriage of Johnson*, 50 Kan. App. 2d

687, 691-92, 336 P.3d 330 (2014) (citing *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 [2013]). Appellate courts do not reweigh evidence, redetermine questions of fact, or pass on witness credibility in child custody disputes. *In re Marriage of Bahlmann*, 56 Kan. App. 2d at 903-04.

Still, when determining child custody and residency, district courts are required to consider several statutory factors. K.S.A. 2020 Supp. 23-3203(a)(1)-(18). Under K.S.A. 2020 Supp. 23-3203(a)(9), a district court must consider "evidence of domestic abuse, including, but not limited to: (A) A pattern or history of physically or emotionally abusive behavior or threat thereof used by one person to gain or maintain domination and control over an intimate partner or household member; or (B) an act of domestic violence." Thus the district court's failure to consider domestic abuse would be an error of law.

During trial, Mother testified about Father's anger issues:

"[Father has] had anger issues and violence. The steroids only heightened that and made his temper shorter than ever. I've watched him use the dog as a punching bag because the dog got into a trash and knocked the trash over, and he would just stand there and punch the dog. It didn't matter it was a wall or a dog, or it didn't matter if it was me. There were times we would argue and I'd be done with the conversation and he would stand in the door frame of the bedroom, and I'd be in the bedroom, and he wouldn't let me out, and I would try to go around him. He would put his hands around me and squeeze as hard as he could until I would stop moving and this happened so many times. An I don't know what to do because he has like 100 pounds on me and I just—I can't move. I can't barely breath. And then sometimes he will just like walk backwards and lay on top of me on the bed, still squeezing me until I stop talking or her gets his way. And I'm like, okay, I'm done arguing. Because at that point what else can I do."

Mother argues the district court simply disregarded this testimony when making its ruling. But Mother failed to object to the district court's findings of fact and

8

conclusions of law. Generally, a party needs to object to inadequate findings of fact and conclusions of law to allow the district court an opportunity to correct alleged inadequacies. When a party fails to object, appellate courts presume the trial court found all facts necessary to support its judgment. *Foster v. Stonebridge Life Ins. Co.*, 50 Kan. App. 2d 1, 11-12, 327 P. 3d 1014 (2012); *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 703-04, 229 P.3d 1187 (2010). We do so here.

"An appellate court will consider a remand for additional findings and conclusions only when the record on review does not support application of this presumption, thereby precluding the exercise of meaningful appellate review." *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 704. Here, the record does not preclude meaningful review.

The DCF report alleging that Father neglected or abused N.E. does not help Mother's case. Mother's testimony suggests that she was the source of that report. And the allegations related to bug bites, not traditional abuse. DCF investigated the allegations, Father responded appropriately by spraying his property, and DCF found the report to be unsubstantiated. No facts suggest that Father abused N.E. or Mother's other child.

The district court considered both Father and Mother's testimony before finding that Father should retain residential custody of N.E. When asked about his anger, Father stated: "I am human. I have lost my temper in the past. Discussions with [Mother] did occasionally end in me being overly angry." Although the district court never specifically discussed Mother's allegations that Father had squeezed her or laid on top of her, it did acknowledge Father's anger issues. While the district court stopped short of requiring Father to complete anger management, the district court repeatedly told him he might need to get help for the issue.

The district court's acknowledgment of Father's anger issues shows that it considered Mother's testimony. The fact the district court did not specifically mention the

9

allegations in its ruling does not mean it did not consider Mother's testimony. Accordingly, the district court's ruling was not based on an error of law for failure to consider evidence. See *In re Marriage of Bahlmann*, 56 Kan. App. 2d at 903.

*Did the District Court Err by Failing to Consider N.E.'s Relationship with Her Half-sister?*

Mother also argues the district court erred as a matter of law by failing to consider the relationship between N.E. and her half-sister. Notwithstanding Mother's failure to object, the record does not support her argument.

Under K.S.A. 2020 Supp. 23-3203(a)(6), the district court must consider "the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests." Mother alleges that the district court mentioned N.E.'s half-sister only once in its decision. But in doing so, Mother omits some of the district court's findings on the issue.

In total, the district court stated: "Right now, this is where [N.E.] has extended family and I understand she's got her half-sister . . . in Texas, but I think weighing everything I need to weigh, the balance is in favor of keeping her here." The statement shows that the district court not only considered N.E.'s relationship with her half-sister, but also her relationship with other family members, as is required under K.S.A. 2020 Supp. 23-3203(a)(6).

During trial, Father testified that his extended family lived in Hutchinson. This included N.E.'s grandparents, aunt, uncle, and cousins. Father also testified that N.E. sees her extended family regularly and that N.E. got along with those family members.

On the other hand, Mother testified that N.E. was close with her half-sister and the two had been around each other since N.E. was born. She also said they both told her they missed each other and wished to spend more time together, which is understandable under the circumstances. But Mother and N.E.'s half-sister were the only family members who lived in Texas.

As the district court made clear, it was confused as to why Mother chose to move to Texas when the fathers of both her children lived in Kansas. The district court credited Mother for making a good economic decision but also found that the distance between Mother and Father was unfortunate because it made it harder for them to spend as much time as possible with N.E. In the future, the district court hoped that Mother and Father could find a closer living situation, but it wanted N.E. to remain around her extended family in Hutchinson.

These findings show that the district court considered N.E.'s relationship with all her family members, including her half-sister. Thus, the district court followed the statutory requirements when rendering its decision. See K.S.A. 2020 Supp. 23-3203(a)(6). As a result, the district court's decision was not based on an error of law. See *In re Marriage of Bahlmann*, 56 Kan. App. 2d at 903.

*Did the District Court Act Unreasonably by Granting Residential Custody to Father?*

Mother's overarching argument is that the district court abused its discretion by awarding Father residential custody of N.E. She contends that decision was unreasonable given the district court's finding that Father needed help for his anger issues. To support her claim, Mother points to her testimony about Father's acts and an exhibit showing a hole in a door.

11

Yet the record shows the district court considered the evidence surrounding Father's anger issues when rendering its decision. As stated above, the district court told Father that he might need to get some insight into his anger and agreed with Mother that damage to property, especially in front of a child, was not an appropriate reaction. But after hearing testimony on the subject, the district court decided against ordering Father to attend any anger management.

The record also shows that the district court weighed that testimony against other considerations when making its decision, as it had to under K.S.A. 2020 Supp. 23-3203(a). For example, the district court recognized the relationships that N.E. had with her extended family in Hutchinson and wanted those to continue. The district court also acknowledged that Mother's moving away made it harder for both parties to spend enough time with N.E.

Mother acknowledges that this court does not reweigh the evidence presented at trial, redetermine questions of fact, or pass on witness credibility, but her argument is essentially asking this court to do just that. See *In re Marriage of Bahlmann*, 56 Kan. App. 2d at 903-04. Under the circumstances, the district court's decision was reasonable. Because the district court did not abuse its discretion by granting Father primary custody of N.E., we affirm that decision.

*Is Father Entitled to Attorney Fees?*

We next address Father's motion for attorney fees for services on appeal. Father contends that Mother's appeal was frivolous, entitling him to fees.

12

*Timeliness of the motion for attorney fees*

Mother contends Father's fee motion was untimely because it was filed more than 14 days after the date of the letter assigning the case to a non-argument calendar. See Supreme Court Rule 7.07(b)(2) (2020 Kan. S. Ct. R. 50). Both parties agree the case was assigned to the summary calendar docket on December 7, 2020, and Father filed the motion for attorney fees on December 22, 2020. Mother contends the motion was filed one day late, while Father believes the motion was filed on the last possible day under Supreme Court Rule 7.07(b)(2).

Supreme Court Rule 1.05(d) (2020 Kan. S. Ct. R. 6) states: "In the appellate courts, time is computed under K.S.A. 60-206(a) and (d)." So we exclude December 7 as the day that triggered the 14-day period and count every day thereafter. Mother is correct that Father's motion filed on December 22 was one day late. See K.S.A. 2020 Supp. 60-206(a)(1); see also Rule 7.07(b)(2). But our Supreme Court suspended the statutes of limitation, statutory time standards, deadlines, and time limitations due to COVID-19. Kansas Supreme Court Administrative Order 2021-PR-009, effective January 26, 2021 (incorporating by reference all previous administrative orders suspending deadlines). Thus, we consider Father's motion to be timely.

*Is Mother's Appeal Frivolous?*

Rule 7.07(b)(1) allows this court to award attorney fees "for services on appeal in a case in which the district court had authority to award attorney fees." (2020 Kan. S. Ct. R. 50). Our Supreme Court has stated that "Rule 7.07(b) applies to all requests for attorney fees related to an appeal, whether authorized under . . . [a] statute, or by an agreement between the parties." *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 163, 298 P.3d 1120 (2013). Under the Kansas Family Law Code, "[c]osts and attorney

13

fees may be awarded to either party as justice and equity require." K.S.A. 2020 Supp. 23-2715.

The determining question is whether Mother's appeal was frivolous, as Father contends. Under Rule 7.07(c):

"If an appellate court finds that an appeal has been taken frivolously, or only for the purpose of harassment or delay, it may assess against the appellant or appellant's counsel, or both, the cost of reproduction of the appellee's brief and a reasonable attorney fee for the appellee's counsel. A motion for attorney fees under this subsection must comply with subsection (b)(2). If the motion is granted, the mandate must include a statement of the assessment, and execution may issue on the assessment as for any other judgment, or in an original case the clerk of the appellate courts may issue an execution." (2020 Kan. S. Ct. R. 50).

But as Mother points out, Father fails to tell us why Mother's appeal is frivolous. He simply asserts the appeal was frivolous because "[t]he brief of the Appellant showed there was no merit to the appeal." Father cites two cases. The first case defines a frivolous appeal as: "'One in which no justiciable question has been presented and appeal is readily recognized as devoid of merit in that there is little prospect that it can ever succeed.'" *Blank v. Chawla*, 234 Kan. 975, 982, 678 P.2d 162 (quoting Black's Law Dictionary 601 [5th ed. 1979]). But Father fails to show how Mother's appeal fits within that definition.

The second case, *Geiger v. Wallace*, 233 Kan. 656, 662, 664 P.2d 846 (1983), found the issues presented on the appeal were novel, so declined to find the appeal frivolous. But Father does not show how *Geiger* applies here. Although the child custody issues raised here were not novel, neither was their outcome certain, given the multiple factual variations in such matters.

14

The only explanation Father provides about why Mother's appeal is frivolous is in the final paragraph of his reply:

"As asserted in [Mother's] brief, there is little prospect that this appeal can ever succeed. The issue raised was whether the district court abused its discretion in awarding residential custody of the minor child to [Father]. The research as provided in [Mother's] brief indicates it is very difficult for a court to be reversed on an abuse of discretion standard."

But Mother's statement in her brief is more aptly characterized as her recognizing the standard of review and her burden to show an abuse of discretion than her acknowledging that her appeal is meritless. See *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017). Father's argument essentially conflates difficulty with frivolity. And to our knowledge, our court has never found an appeal frivolous just because our standard of review is abuse of discretion. Instead, we have reversed many cases, having found an abuse of discretion. Although that standard is harder to meet than others, it is met at times.

Mother's appeal presented several important and justiciable questions about the district court's conclusions. Her appeal is not frivolous. Even though Father prevailed on the issues, justice and equity do not require Mother to pay his attorney fees.

We deny Father's motion for attorney fees.

We affirm the district court's decision granting residential custody to Father.